[No. C032952. Third Dist. Jan. 3, 2002.]

CLEO LUETER et al., Cross-complainants and Appellants, v.
THE STATE OF CALIFORNIA et al., Cross-defendants and Appellants.

## COUNSEL

Altemus & Wagner and Stewart C. Altemus for Cross-complainants and Appellants.

Bill Lockyer, Attorney General, Pamela Smith-Steward, Chief Assistant Attorney General, Darryl L. Doke, Thomas D. McCrackin and Alberto L. Gonzalez, Deputy Attorneys General, for Cross-defendants and Appellants.

## OPINION

**SCOTLAND, P. J.**—Having prevailed at trial on a tort claim of negligent spoliation of evidence, cross-complainants (hereafter plaintiffs) respond to the appeal of cross-defendants (hereafter defendants) by asserting that "negligent spoliation is alive and well in the Third [Appellate] District." (Citing *Johnson v. United Services Automobile Assn.* (1998) 67 Cal.App.4th 626 [79 Cal.Rptr.2d 234] [recognizing a limited cause of action for negligent spoliation of evidence].) Our short answer is, "not any more."

The evidence at issue was part of a tire tread that came off the wheel of an oil tanker when the tire blew out and the tanker crashed. The driver and the owner of the tanker wanted the tread as evidence for a lawsuit filed against them by motorists who were injured as a result of the crash. However, the

piece of tread had been taken from the scene of the crash, and later discarded, by employees of the law enforcement agency that investigated the accident. Consequently, the driver and the owner of the tanker, Cleo Lueter and Valley Slurry Seal Company (hereafter plaintiffs), sued the investigating agency and some of its employees for discarding the evidence. A jury awarded plaintiffs damages in the sums of $195,264.85 for negligent spoliation of the evidence and $1.50 for its conversion.

On appeal, defendants—the State of California, the California Highway Patrol (hereafter CHP), CHP Officers William Brooks and Reid Thompson, and CHP employee Earl Stephens—contend that the California Supreme Court's rationale in precluding tort causes of action for intentional spoliation of evidence must be extended to preclude a tort cause of action for negligent spoliation of evidence. (See *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464 [84 Cal.Rptr.2d 852, 976 P.2d 223]; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 [74 Cal.Rptr.2d 248, 954 P.2d 511].)

For reasons that follow, we agree with the Second Appellate District and the Fourth Appellate District that (1) this court's decision in *Johnson v. United Services Automobile Assn., supra,* 67 Cal.App.4th 626, does not survive the rationale of the Supreme Court's subsequent holding in *Temple Community Hospital v. Superior Court, supra,* 20 Cal.4th 464, and (2) there is no tort cause of action for the negligent spoliation of evidence. We also reject plaintiffs' assertion, on cross-appeal, that the spoliation measure of damages applies to the conversion cause of action.

Accordingly, we shall reverse the judgment to the extent that it awards spoliation damages, affirm the judgment to the extent that it awards damages of $1.50 for conversion, and direct the trial court to enter a new judgment accordingly.[1]

### FACTS AND PROCEDURAL BACKGROUND

Valley Slurry Seal employee Cleo Lueter was involved in a traffic accident on May 3, 1996, while driving one of the company's oil tankers on Interstate 80 followed by a fellow employee, Christopher Rickey, who was operating a pickup truck.

After passing the City of Davis, Lueter moved into the center lane. Lueter and Rickey testified that Lueter adhered strictly to the 55 miles per hour

---

[1] In light of our disposition of the case, we need not address defendants' other claims of error.

speed limit for large commercial trucks. However, other motorists testified that Lueter was driving over 65 miles per hour.

There is no conflict about what happened next. The left front tire on the oil tanker blew out, and Lueter lost control as the tanker pulled to the left. The tanker hit a car being driven by Larry McCanless and forced it into the center divider. The tanker then went over the guardrail before coming to rest. In a chain reaction, motorists traveling in the opposite direction collided with the tanker or with other cars attempting to avoid the tanker.

There was considerable activity at the scene for the next few hours. The fire department and paramedics arrived, and transported two of the injured motorists to medical facilities. CHP Officer William Brooks became chief investigating officer for the accident. Other CHP officers, including Jack Polen and Donald Campbell, arrived to assist. Campbell had expertise in inspecting commercial vehicles for equipment violations. The CHP's duties at the scene included making sure anyone who was injured received medical care, ensuring there would be no hazardous material spill, rerouting traffic around the scene, interviewing witnesses, taking photographs, drawing diagrams to document the circumstances of the accident, and clearing the road so that it could be reopened.

During the course of the tire blowout and ensuing crash, most of the tire tread was torn from the left front wheel of the oil tanker and was broken into pieces. Officer Brooks decided that he should have the commercial vehicle officer, Campbell, look at the tire tread to determine whether it was a recap, which Brooks thought might be illegal on the steering axle. At Brooks's request, Officer Polen picked up a piece of the tread that was two feet to three feet long and took it to the CHP's Woodland office.

Immediately after the crash, Christopher Rickey, the Valley Slurry Seal employee who was following Lueter, called the company on a two-way radio and reported the crash. Bryan Holt, the company business manager, and John James, a company field superintendent, drove to the scene to gather information and offer assistance. Holt testified that he spoke with an unidentified officer there; however, officers who were at the scene disputed Holt's claim.

According to Holt, while everyone was working together to clean up the scene, he told an officer that Valley Slurry Seal wanted the tire because it was "the start of this whole mess." He was told that the CHP was taking a piece of the tire tread into evidence, but that he could see it at the CHP's Woodland office. Holt was allowed to take the wheel rim and tire carcass to the Valley Slurry Seal shop. Although other chunks of the tread were lying about, Holt did not gather any of them, and the remaining pieces of tread were apparently left for cleanup as road debris.

Holt acknowledged that he did not inform Brooks, the chief investigating officer, or Campbell, the commercial vehicle officer, of plaintiffs' desire to obtain the partial tire tread taken as evidence by Officer Polen. Holt also acknowledged that he did not send a confirmation letter or verbally contact anyone at the CHP's Woodland office to advise that the tire tread remnant should be retained.

When Officer Polen arrived at the CHP's Woodland office with the piece of tire tread, Evidence Officer Reid Thompson put an identifying number on the tread and placed it in a storage shed. The shed is used by CHP automotive technician, Earl Stephens, to store things such as tires, flares, extra filters, and the like.

A few days after the accident, Officer Campbell went to the Valley Slurry Seal shop to inspect the tire carcass. Unable to detect any defects, he determined that no citation was warranted. After that determination, Officer Brooks regarded the piece of tire tread as roadside debris, "just junk," and perceived no reason to keep it.

Officer Thompson testified that, after the decision not to issue a citation, he also regarded the piece of tire tread as roadside debris of "no value," and intended to throw it out. But CHP automotive technician Earl Stephens was the person who disposed of the tread. In his words, "because I stumbled over it probably once too often . . . , [I] threw it in the dumpster [with other trash]."

In June 1996, Tammi Hashwa, who was injured in the chain reaction collisions resulting from the oil tanker crash, filed a lawsuit for personal injury against Lueter and Valley Slurry Seal, alleging negligence in the maintenance and driving of the tanker.

In August 1996, plaintiffs filed a cross-complaint against Michelin North America, Inc. (hereafter Michelin) for equitable contribution and indemnity, alleging negligence in the design and/or manufacture of the tire. Nearly six months after the crash, plaintiffs' expert, Eugene Jackson, a forensic engineer specializing in tire failures, examined the tire carcass and then sought to examine the piece of tire tread at the CHP's Woodland office. He was unable to do so because Stephens had thrown it out.

Plaintiffs dismissed their cross-complaint against Michelin and filed this cross-complaint against the State of California and the CHP. Thereafter, Brooks, Stephens, and Thompson were added as defendants.

Before trial, plaintiffs filed a motion in limine to preclude defendants from offering evidence that the tire was not defective. According to plaintiffs, a

defense expert was prepared to testify that (1) the missing tire tread is a "mirror image" of the tire carcass from which it came and, thus, because the carcass showed no evidence of tire defects, the tread would have no defects, and (2) in the defense expert's opinion, a road hazard caused the tire to gradually lose air, ultimately resulting in the blowout. In their own motion in limine, defendants asserted that plaintiff's expert, Eugene Jackson, believed that the most likely cause of the blowout and tread loss was a puncture from a road hazard, and that a perfectly manufactured tire would have blown due to its damaged state.

None of this evidence was presented to the jury because the court ruled that whether the tire may have had a defect would not be an issue in the lawsuit. Instead, the court instructed the jurors as follows: (1) "Valley Slurry Seal does not have to prove that it is more likely than not that the tire manufactured by Michelin which failed was defective"; (2) in order to support recovery by plaintiffs, it is sufficient that the tire tread "might have constituted evidence" in an existing or potential action; and (3) "You are to presume that the tire tread would have established that the tire in question was defective."

Together, the court's evidentiary rulings and instructions in effect constituted a directed verdict on the issues of causation and proximately caused injury with respect to the negligent spoliation cause of action.

The jury found in favor of plaintiffs on their negligent spoliation claim, finding total spoliation damages of $216,960.94.[2] The jury also found in favor of plaintiffs on their claim for conversion, with damages of $1.50 plus interest. With respect to the spoliation cause of action, the jury found Valley Slurry Seal was 10 percent responsible. Hence, the court entered judgment in favor of plaintiffs in the sum of $195,264.85.

## DISCUSSION

### I. Negligent Spoliation of Evidence

#### A. Procedure

Defendants phrase their objection to the negligent spoliation cause of action in terms of error in the denial of their motion for summary adjudication of that cause of action. ■ Plaintiffs correctly note that, in

---

[2]The damages represented the costs incurred in clearing the wreck; costs of claims adjusters and assessors who investigated the incident; legal fees, expenses, and expert fees associated with defending claims; property damage to the oil tanker; reimbursement for Lueter's workers' compensation benefits, medical expenses, and bodily injuries; and sums paid in settlement of various claims.

general, an appellate court will not set aside a valid verdict following a trial by reference to the pretrial motion for summary adjudication. (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 908 [85 Cal.Rptr.2d 301].) However, it is unnecessary for defendants to raise the issue by reference to their motion for summary adjudication. ■ This is so because a judgment must be reversed on appeal where, at trial, the plaintiff failed to establish a right to recover under a legally recognized cause of action. (See *Watson v. Department of Transportation* (1998) 68 Cal.App.4th 885, 890 [80 Cal.Rptr.2d 594].) Thus, we will consider defendants' contention in light of the trial record.

B. *Analysis*

■ In *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 [74 Cal.Rptr.2d 248, 954 P.2d 511] (hereafter *Cedars-Sinai*), the Supreme Court considered whether a cause of action for intentional spoliation of evidence should be recognized in a first party case, i.e., where the alleged spoliator is a party to the underlying litigation. The court held that "when the [alleged] spoliation is or reasonably should have been discovered before the conclusion of the underlying litigation, it is preferable to rely on existing nontort remedies rather than creating a tort remedy." (*Id.* at p. 4.) "Accordingly, [in such a situation] there is no tort remedy for the intentional spoliation of evidence by a party to the cause of action to which the spoliated evidence is relevant . . . ." (*Id.* at p. 17.)

Later, in *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464 [84 Cal.Rptr.2d 852, 976 P.2d 223] (hereafter *Temple Community*), the court considered whether a cause of action for intentional spoliation of evidence should be recognized in a third party situation, i.e., where the alleged spoliator is not a party to the underlying litigation. Finding that many of the factors which led the court in *Cedars-Sinai* to reject a tort cause of action for first party spoliation also "apply with equal weight" to a third party case, the court held that "no tort cause of action will lie for intentional third party spoliation of evidence." (*Id.* at p. 466.)

The rationale of *Temple Community* was as follows: The Supreme Court consistently has "cautioned against expanding tort liability to include litigation-related misconduct other than malicious prosecution," noting that regulatory, criminal, and disciplinary sanctions already exist to accomplish the goals of deterring and punishing litigation-related misconduct. (*Temple Community, supra,* 20 Cal.4th at p. 471.) Moreover, the "goal of having disputes resolved in a single proceeding whose outcome is final as to *both* of the parties would be undermined if a party who was disappointed in a verdict

were permitted to bring a new lawsuit against a new party, claiming that the first lawsuit would have been won but for the new party's destruction or suppression of evidence." (*Ibid.*, original italics.) In fact, permitting such derivative litigation could lead to endless rounds of lawsuits and a significant potential for meritless claims—problems that the Supreme Court noted with disapproval in *Cedars-Sinai.* (*Temple Community, supra,* 20 Cal.4th at pp. 472-473.) Although spoliation may deprive a party of critical evidence, and even a defense, this potential injustice is outweighed by what the Supreme Court identified as "the greater harm of subjecting parties, witnesses, and the courts to unending litigation over the conduct and outcome of a lawsuit." (*Id.* at p. 473.) Another practical consideration that weighed heavily is the likelihood that harm and causation will be uncertain in a substantial proportion of spoliation cases. (*Id.* at p. 474.) " 'Without knowing the content and weight of the spoliated evidence, it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action. The jury could only speculate as to what the nature of the spoliated evidence was and what effect it might have had on the outcome of the underlying litigation.' " (*Ibid.*, quoting *Cedars-Sinai, supra,* 18 Cal.4th at p. 14.) Assuming injury, "it may be difficult to identify whether the spoliation caused damage to the defendant or to the plaintiff in the underlying litigation. When the spoliator is not acting at the behest of a party, both parties in the underlying litigation may be victimized by the destruction of evidence, and in the absence of the evidence it is difficult to determine which party has been affected more adversely." (*Temple Community, supra,* 20 Cal.4th at pp. 474-475.) It follows that recognizing a tort remedy for third party spoliation would result in considerable "burdens and costs," i.e., jury confusion, the potential for inaccurate and arbitrary verdicts, the possibility of abuse in bringing such an action, and the resulting burdens to the judicial system, litigants, and witnesses. (*Id.* at p. 476.) In addition, "the broad threat of potential liability . . . might well cause numerous persons and enterprises to undertake wasteful and unnecessary record and evidence retention practices." (*Ibid.*) "Finally, [the Supreme Court's] conclusion that recognition of a tort cause of action for intentional third party spoliation would be unwarranted is strengthened by the realization how anomalous it would be to impose such liability—including potential punitive damages—upon those spoliators who are third parties to litigation, when [the court] concluded in *Cedars-Sinai* that tort liability for spoliation should not be imposed upon litigants who engaged in such behavior to obtain an advantage in their own litigation." (*Temple Community, supra,* 20 Cal.4th at p. 477.)

■ *Cedars-Sinai* and *Temple Community* did not involve claims for negligent spoliation, and the Supreme Court found no need to discuss such a

tort claim. (*Temple Community, supra*, 20 Cal.4th at p. 471, fn. 3.) But other courts have.

Prior to the holding in *Temple Community*, this court decided *Johnson v. United Services Automobile Assn., supra,* 67 Cal.App.4th 626 (hereafter *Johnson*). Concluding that the reasoning of the Supreme Court in *Cedars-Sinai* did not foreclose a tort of negligent spoliation, *Johnson* recognized "a limited cause of action for negligent spoliation of evidence by a third party spoliator" based on a special relationship that arises out of such things as an undertaking to preserve the evidence, an agreement to preserve the evidence, a specific request to preserve the evidence, or a relationship based on contract, statute, or regulation. (*Id.* at pp. 629, 635.)

The Fourth Appellate District disagreed in *Farmers Ins. Exchange v. Superior Court* (2000) 79 Cal.App.4th 1400 [95 Cal.Rptr.2d 51] (hereafter *Farmers Ins. Exchange*). Considering the policy factors identified in *Temple Community*, the court (1) concluded that the fact the tort "is for negligent rather [than] intentional spoliation carries no significant weight in the balancing process," and (2) "decline[d] to recognize a tort for negligent third party spoliation of evidence." (*Farmers Ins. Exchange, supra,* 79 Cal.App.4th at p. 1407.)

Likewise, the Second Appellate District in *Coprich v. Superior Court* (2000) 80 Cal.App.4th 1081 [95 Cal.Rptr.2d 884] (hereafter *Coprich*) considered the policy factors identified in *Cedars-Sinai* and *Temple Community* and stated: "These policy considerations compel the conclusion that the burdens and costs to litigants, the judicial system, and others if the courts were to allow a tort remedy for negligent spoliation of evidence would outweigh the limited benefits. We therefore conclude there is no tort remedy for first party or third party negligent spoliation of evidence." (*Coprich, supra,* 80 Cal.App.4th at pp. 1089-1090, fn. omitted.)

We agree with the results in *Farmers Ins. Exchange* and *Coprich*. As we will explain, the circumstances of the case now before us amply demonstrate that the factors identified in *Temple Community, supra,* 20 Cal.4th 464 in rejecting a tort of intentional third party spoliation militate against the recognition of a tort of negligent spoliation of evidence.

As we have noted, *Temple Community* concluded that it would be anomalous to impose tort liability upon third party spoliators when, in *Cedars-Sinai*, the court had refused to impose tort liability on litigants who had engaged in such behavior to secure an advantage in their own litigation. (*Temple Community, supra,* 20 Cal.4th at p. 477.) Certainly, it would be even

more anomalous to impose tort liability upon a negligent spoliator whose conduct is not near so egregious as that of an intentional spoliator. In this case, for example, if defendants had testified that they knew the tire tread might have significance in a civil action and deliberately threw it away in order to avoid being embroiled in civil litigation, out of animus toward a party, or for other similar reasons, they could not be responsible for spoliation damages. But since their conduct was, at most, mere negligence, they were essentially forced to become retroactive insurers of plaintiffs. As recognized in *Farmers Ins. Exchange, supra,* 79 Cal.App.4th at page 1407, this created an absurdity.

And we must be mindful of the fact that recognizing a tort cause of action for negligent spoliation would, in many if not all instances, effectively abrogate the Supreme Court's decisions in *Cedars-Sinai* and *Temple Community.* This is so because most types of conduct that could be called intentional also can be rephrased in terms of negligence. (See *American Employer's Ins. Co. v. Smith* (1980) 105 Cal.App.3d 94, 100 [163 Cal.Rptr. 649].) In this light, the recognition of a negligent spoliation cause of action would provide a loophole that effectively could swallow the holdings of *Cedars-Sinai* and *Temple Community.*

Other factors militate against a tort of negligent spoliation of evidence. For example, *Temple Community* bemoaned the "endless spiral of lawsuits over litigation-related misconduct [that] could ensue were we to recognize a tort cause of action for third party spoliation." (*Temple Community, supra,* 20 Cal.4th at p. 473.) It seems obvious that recognizing a cause of action for negligent spoliation would expand the potential plaintiffs and defendants, and associated burdens, far more because the spoliation plaintiff would not even have to identify conduct that could be called intentional in order to pursue a claim.

It is true that a special-relationship limitation on a tort of negligent spoliation of evidence, as espoused in *Johnson, supra,* 67 Cal.App.4th 626, would tend to restrain somewhat the "endless spiral of lawsuits" that *Temple Community* feared. (*Temple Community, supra,* 20 Cal.4th at p. 473.) Thus, the dissenters in that case would recognize a tort of intentional third party spoliation of evidence where the spoliator "intend[s] that the act of spoliation affect the outcome of the underlying cause of action to which the evidence is relevant; otherwise stated, the spoliator must intend to harm the spoliation victim's ability to bring or defend against a legal claim." (*Id.* at p. 485 (dis. opn. of Kennard, J.).) But the majority refused to recognize a tort claim for spoliation even with this significant limitation. Moreover, the majority refused to recognize a tort based upon statute or regulation, observing that, to the extent such a duty may be found, the Legislature or

regulatory body that imposed the duty will possess the authority to devise an effective sanction for its violation. (*Id.* at p. 477.) It follows that an amorphous requirement of a "special relationship" would not be sufficient to overcome the concerns of the *Temple Community* majority.

Another factor that weighed against recognizing a spoliation cause of action in *Temple Community* was the fact that meritless claims could easily be pursued and the threat of liability might cause individuals and entities to engage in unnecessary and expensive retention policies. (*Temple Community, supra,* 20 Cal.4th at p. 470.) This potential would be exacerbated by recognizing a tort of negligent spoliation of evidence. Indeed, nothing could be thrown away because a person or entity never could be certain whether someone might be able to claim the potential evidentiary value of an item should have been foreseen. Limiting the cause of action to a special relationship would not avoid this problem since an employer always would fear someone might be able to claim that an unidentified employee promised to keep the material, thus giving rise to a special relationship.

As with intentional spoliation of evidence, the uncertainty of the fact of harm and causation also weighs heavily against recognizing a tort cause of negligent spoliation. (*Temple Community, supra,* 20 Cal.4th at pp. 474-475.) The facts of the case before us well illustrate this concern of the Supreme Court.

In his deposition, which was before the trial court for purposes of its pretrial rulings, plaintiffs' expert testified that there were no design issues presented with respect to the tire at issue. When asked whether he had attempted to learn if other tires of the same type or that were made at the same time had been defective, he said he had not. He explained that "in Michelin you're not going to find it" because Michelin's quality assurance program is too tight to permit a whole line of defective tires; with Michelin, a tire defect is a spotty thing that would happen once in a while.

Plaintiffs' expert further testified that, in most instances of tire blowout, the cause is not a defective tire; although there is a certain percentage where a defective tire is involved. There are occasions where a tire defect is not apparent from the tire carcass but can be detected from the tread. However, in his words, that is "a random kind of occurrence."

According to plaintiffs' expert, the most common cause of a tire blowout is preexisting damage to the tire. He explained that if a roadway hazard, such as a nail or other object, damages the innermost layer of the tire, air can seep into the area between the tread and carcass to cause a point of separation.

Centrifugal force can cause the separation to grow, and when it is large enough it pulls apart and blows out. He examined the interior of the tire carcass at issue in this case and found multiple points of preexisting damage consistent with such a scenario.

Hence, plaintiffs' expert formed the opinion that the most likely cause of the blowout was a preexisting puncture or damage to the tire. But he could not rule out the possibility of a defective tire. In order to complete his analysis, he would want to reassemble the tread, locate the points that correspond with the interior damage that he discovered, and see whether those portions of the tread show similar damage. He also would want to examine the tread to determine whether it might reflect a point of pre-existing separation that does not correspond with interior damage and that is not reflected on the tire carcass.

Due to the trial court's pretrial rulings, defendants were not permitted to present evidence as to whether the tire was defective, and were not permitted to question plaintiffs' expert concerning his opinion about the cause of the blowout. As a result, the evidence he presented to the jury was truncated. In addition to recounting his inability to analyze the partial tire tread that had been discarded by defendants, and explaining various ways in which a tire can be defective, he testified basically as follows: Sometimes defective tires can "get through the system." Analyzing a tire carcass is not always suffi-cient to determine whether a tire is defective. Sometimes it is necessary to examine the tire tread. The piece of tread discarded by defendants may have provided a basis upon which to determine whether the tire was defective. While he has found some defective tires, most of the time his analyses have discovered no defect.

From this information, it is apparent that plaintiffs cannot establish any-thing approaching a reasonable probability that the piece of tire tread actually had any evidentiary value. Because testimony showed it generally is unlikely that the cause of any particular tire blowout is a defect in the tire, neither the trial record nor the deposition of plaintiffs' expert provided any basis for believing that the cause of this particular blowout may have been a defective tire. While it is possible a tire tread may reflect a defect that is not also reflected in the tire carcass, the fact the carcass in this case provided no evidence of a defect made a tire defect a less likely possibility. And the fact that plaintiffs' expert discovered multiple areas of preexisting damage to the inner portion of the carcass, which is the most common reason for a blowout, makes it even less likely there was a tire defect. Keeping in mind that defendants had only a portion of the tread, it is unlikely that the piece of tread in their possession would have reflected a defect if there had been one somewhere on the tire.

The cumulative result of the multiple, mere possibilities reflected in the deposition and testimony of plaintiffs' expert is that the possibility the piece of tread in defendants' possession would have had evidentiary value in the underlying litigation was minimal at best.

The trial court resolved the intractable nature of the proof by removing the issues of injury and causation from dispute. Consequently, the court refused to permit defendants to present evidence concerning whether the tire may have been defective and instructed the jurors that (1) plaintiffs did not have to prove that it was likely the tire was defective, (2) it was sufficient that the piece of tire tread might have constituted evidence in an existing or potential action, and (3) the jury must presume that the tire tread would have established that the tire was defective.

The court's ruling and instructions were contrary to the subsequent decision in *Temple Community*, which establishes that the answer to the intractable nature of the proof of injury and causation in a spoliation case is not to direct a verdict against the defendant on those issues, and thus impose a wholly speculative damage award. Rather, it is to refuse to recognize a cause of action for spoliation of evidence. (*Temple Community, supra*, 20 Cal.4th at pp. 475-476.)

We are satisfied that it follows from the decision in *Temple Community*, like night follows day, that courts cannot recognize a tort cause of action for negligent spoliation of evidence.[3]

Our conclusion is not altered by the fact that, in plaintiffs' words, the CHP is a state agency that "prevented [them] from taking [their] own tire tread from the accident scene" and, thus, in their view, had a duty to preserve the evidence. (See *In re Michael L.* (1985) 39 Cal.3d 81, 85-86 [216 Cal.Rptr. 140, 702 P.2d 222].)

Government Code section 815 specifies that, except as otherwise provided by statute, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person. Government Code section 815.2, subdivision (a) provides that a public entity is liable for injury proximately caused by an act or omission of an employee within the scope of employment if the act or omission would give rise to a cause of action against the employee. Government Code section 820, subdivision (a) specifies that, except as otherwise

---

[3]Here, as in other cases addressing the matter, we are concerned solely with the question of a cause of action in tort. The decisional authorities do not foreclose an action in contract where the defendant is under a contractual obligation to preserve evidence. (*Temple Community, supra*, 20 Cal.4th at p. 477; *Coprich, supra*, 80 Cal.App.4th at pp. 1091-1092.)

provided by statute, a public employee is liable for injury to the same extent as a private person.

Together these statutes establish two principles: (1) unless they are granted specific statutory immunity, a public entity and its employees are liable in tort for the same causes of action that could be brought against a private person; and (2) absent a statute specifically imposing liability, a public entity and its employees are not liable for causes of action in tort that could not be pursued against a private party.

For the reasons stated above, the tort of negligent spoliation of evidence cannot be recognized against a private party. It follows that any liability for spoliation against a public entity and its employees must be created statutorily rather than judicially.

In order to find a statutorily based cause of action for negligent spoliation, it is not enough to find that the public entity had a legal duty with respect to property. Even though a person may have a duty to preserve evidence, countervailing considerations dictate against an expansive, speculative tort of spoliation. (*Temple Community, supra,* 20 Cal.4th at pp. 469-471; *Cedars-Sinai, supra,* 18 Cal.4th at p. 4.) Instead, a duty to preserve evidence should be addressed through other means (*Cedars-Sinai, supra,* 18 Cal.4th at p. 4), such as effective sanctions devised by the Legislature or by regulatory bodies. (*Temple Community, supra,* 20 Cal.4th at p. 477.) It follows that in order to establish a tort for spoliation of evidence, a statute must expressly impose a spoliation remedy.

The fact that, in some instances, civil litigants may benefit incidentally from a law enforcement agency's duty to preserve evidence in a criminal case does not establish a duty that runs to prospective civil litigants (see *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 503 [93 Cal.Rptr.2d 327, 993 P.2d 983]); nor does it establish a tort cause of action for spoliation of evidence (*Temple Community, supra,* 20 Cal.4th at p. 477).

Plaintiffs assert that when property is seized as evidence and it is determined that no criminal charges will be brought, a law enforcement agency has a duty to return the property to its owner. That duty may be enforced through a special proceeding for the return of property (*Ensoniq Corp. v. Superior Court* (1998) 65 Cal.App.4th 1537, 1547 [77 Cal.Rptr.2d 507]), or by application of our claim and delivery statutes (Code Civ. Proc., § 511.010 et seq.). However, those proceedings have as their purpose and remedy the recovery of actual possession of property. To be applicable, it must be in the possession of the defendant. (*Stockton M. P. Co. v. Mariposa County* (1950)

99 Cal.App.2d 210, 215 [221 P.2d 232].) Where the property has been lost or destroyed before an action is brought, the appropriate remedy is a cause of action for damages, such as are available in a cause of action for conversion. (*Faulkner v. First National Bank* (1900) 130 Cal. 258, 267 [62 P. 463].) We will discuss conversion in the next portion of this opinion. For now, it is sufficient to say that the above authorities do not compel the recognition of a tort for spoliation of evidence.

Plaintiffs also rely upon the constitutional guarantee that a person will not be deprived of his or her property without due process of law and just compensation. (Cal. Const., art. I, §§ 1, 7, subd. (a), 19.) In general, the injury, destruction, or loss of property caused by a public employee must be addressed through application of traditional tort principles. Only where injury results from a deliberate act performed for the purpose of carrying out the public objects of a project will an action in inverse condemnation exist. (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 382-383 [41 Cal.Rptr.2d 658, 895 P.2d 900].) Hence, the negligent loss of property by a law enforcement agency is not the type of injury for which inverse condemnation may be maintained. (*Eli v. State of California* (1975) 46 Cal.App.3d 233, 236 [120 Cal.Rptr. 63].) In any event, an inverse condemnation award cannot be based upon an owner's hopes for the property (*People v. La Macchia* (1953) 41 Cal.2d 738, 751 [264 P.2d 15], overruled on another ground in *County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 679-680 [312 P.2d 680]; *City of Los Angeles v. Geiger* (1949) 94 Cal.App.2d 180, 191 [210 P.2d 717]), or upon speculation and conjecture (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1146 [234 Cal.Rptr. 630]; *City of Los Angeles v. Geiger, supra,* 94 Cal.App.2d at p. 191). Thus, an inverse condemnation award would not support the measure of damages plaintiffs seek here.

For all of the reasons stated above, we conclude the judgment in this case must be reversed to the extent that it awards damages for negligent spoliation of evidence.

## II. *Conversion.*

█ On the conversion cause of action, the jury found in favor of plaintiffs and awarded damages of $1.50 plus interest. Defendants do not challenge the judgment insofar as it awarded damages for conversion. However, plaintiffs argue in their cross-appeal that for the conversion they were entitled to the same measure of damages that was awarded on the negligent spoliation cause of action. We are not persuaded.

Civil Code section 3336 states that "[t]he detriment caused by the wrongful conversion of personal property is presumed to be: [¶] First—The value

of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and [¶] Second—A fair compensation for the time and money properly expended in pursuit of the property."

As a general rule, the value of the converted property is the appropriate measure of damages, and resort to the alternative occurs only where a determination of damages on the basis of value would be manifestly unjust. (*Krueger v. Bank of America* (1983) 145 Cal.App.3d 204, 215 [193 Cal.Rptr. 322].) Accordingly, a person claiming damages under the alternative provision must plead and prove special circumstances that require a measure of damages other than value, and the jury must determine whether it was reasonably foreseeable that special injury or damage would result from the conversion. (*Ibid.*) The jury was instructed pursuant to these principles.

Plaintiffs contend that, under the circumstances of this case, Civil Code section 3336 is an inappropriate measure of damages and that the more appropriate statute is Civil Code section 3333, which provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

We disagree. By its terms, Civil Code section 3333 does not apply to conversion since Civil Code section 3336 is an express provision otherwise. In any event, as we will explain, neither section would support the type of award plaintiffs seek.

██ "Whatever the proper measure of damages may be, in a given case, the recovery therefor is still subject to the fundamental rule that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 367-368 [28 Cal.Rptr. 357].) "Actions for the taking and damaging of private property are . . . in the field of tortious action, and hence are subject to the rule that proof of damage is an essential part of the plaintiff's case." (*Id.* at p. 368.)

Although the words "injury" and "damage" often are used interchangeably, a distinction may be made. "Injury" refers to the fact of harm suffered by the plaintiff due to the defendant's conduct. "Damages" refers to the monetary sum that the plaintiff may be awarded as compensation for the

injury. To recover in tort, the plaintiff must prove the fact of proximately caused injury with reasonable certainty. (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168].) When the fact of proximately caused injury is proven sufficiently, the measure of damages to be awarded need only be shown with the degree of certainty that the circumstances of the case permit. (*Ibid.*) But where the fact of proximately caused injury is not proven with reasonable certainty, the plaintiff cannot recover regardless of how much evidence was introduced to show the measure of the recovery sought by the plaintiff. (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 531 [49 Cal.Rptr.2d 793]; *S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536-538 [30 Cal.Rptr.2d 286].)

In this case, the question whether plaintiffs suffered proximately caused injury was irreducibly uncertain. Viewed in a light most favorable to plaintiffs, the testimony established nothing more than a remote possibility that the piece of tire tread discarded by defendants might have been usable evidence in the underlying litigation. A conversion award based on the mere possibility that the tire tread might have had evidentiary value would have been wholly speculative and conjectural.

Accordingly, we reject plaintiffs' contention that they are entitled to spoliation damages on their conversion cause of action.

### DISPOSITION

The judgment is reversed to the extent that it awards damages for negligent spoliation of evidence, and is affirmed to the extent that it awards $1.50 as damages for conversion. The trial court is directed to issue a new judgment accordingly. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 26(a).)

Sims, J., and Callahan, J., concurred.