Filed 8/25/23  Environmental Logistics v. Hayward CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL LOGISTICS, INC., et al., | D080515 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVDS1600695) |
| ROBERT HAYWARD et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and orders of the Superior Court of San Bernardino County, David Cohn, Judge.  Affirmed.

Fennemore and Kevin Abbott for Plaintiffs and Appellants.

Tundis & Lester, Mark John Tundis and Alex D. Lester for Defendants and Respondents Robert Hayward, Carol Suzette Hayward and HEC, Inc.

Disenhouse Law, Bruce E. Disenhouse and Gary O. Poteet, Jr. for Defendant and Respondent Michael Tabush.

No appearance for Defendant and Respondent Suzann Alvarez.

No appearance for Defendant and Respondent Ernesto Alvarez.

Environmental Logistics, Inc. (ELI), Filter Recycling Services, Inc. (FRS), and Variety Employment Corporation (VEC) (sometimes collectively, Plaintiffs) work in tandem in the hazardous waste industry:  ELI treats and transports hazardous waste, FRS stores and recycles it, and VEC provides ELI and FRS with employees in return for a percentage of profits.  In this action, Plaintiffs sued multiple defendants including three of VEC's former employees, Robert Hayward (R. Hayward), Michael Tabush (Tabush), and Ernesto Alvarez (E. Alvarez), alleging that, while employed by VEC, they interfered with current and future customer relationships of ELI and/or FRS and misappropriated trade secrets and other confidential information. Plaintiffs sought damages in excess of $37.55 million.

After weeks of trial, at the end of Plaintiffs' case-in-chief, R. Hayward, his wife defendant Carol Suzette Hayward (C. Hayward), and his company defendant HEC, Inc. (collectively Hayward), Tabush, and E. Alvarez and his wife defendant Suzanne Alvarez (S. Alvarez)[1] (sometimes collectively, Defendants), separately moved for nonsuit on all causes of action.  Their nonsuit motions followed an Evidence Code section 402 hearing in which the trial court excluded the opinions of Plaintiffs' damages expert.  As a result and for other reasons, the court granted Defendants' nonsuit motions as to all causes of action.  In posttrial motions, the court awarded Hayward attorney

---

[1]     Neither E. Alvarez nor S. Alvarez filed a respondent's brief in this appeal.  Nonetheless, we "examine the record on the basis of [Plaintiffs'] brief and [will] reverse only if prejudicial error is found."  (*Votaw Precision Tool Co. v. Air Canada* (1976) 60 Cal.App.3d 52, 55; accord, *Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 80, fn. 2.)

fees and costs, and denied in part Plaintiffs' motion to tax Tabush's expert witness fees.[2]

On appeal, Plaintiffs raise a series of contentions in support of their reversal of the judgment and postjudgment motions. Among others, they contend the trial court prejudicially erred when it: (1) granted the motions in limine of Hayward and Tabush to exclude Plaintiffs' waste management expert, after it found Plaintiffs had acted unreasonably in waiting until the eve of trial to make him available for a deposition; (2) excluded the opinions of Plaintiffs' damages expert based on its finding there was no "nexus" between Plaintiffs fact of injury and resulting damages and Defendants' acts; (3) excluded hundreds of pages of documents attached to three e-mails between R. Hayward and a competitor of Plaintiffs; (4) refused to allow Plaintiffs to reopen their case-in-chief before granting Defendants' nonsuit motions; and (5) granted Hayward's attorney fees motion and denied in part Plaintiffs' motion to tax Tabush's expert fees.

As we explain, we conclude the trial court properly exercised its discretion when it excluded Plaintiffs' waste management expert, the opinions of their damages expert, and the documents attached to the e-mails. We further conclude the court did not err in refusing to allow Plaintiffs to reopen their case-in-chief; and in awarding Hayward attorney fees and denying in part Plaintiffs' motion to tax Tabush's expert fees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In reviewing a judgment based on a nonsuit motion brought at the conclusion of a plaintiff's case-in-chief, we must accept as true the evidence

---

[2] The trial court, however, denied Tabush's motion for an award of attorney fees and costs, which is the subject of a separate appeal. (See *Environmental Logistics, Inc., et al. v. Tabush*, case No. D080516.)

3

most favorable to the plaintiff and disregard any conflicting evidence. (See *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*); see also *Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328 (*Alpert*) [noting a nonsuit motion operates as a "demurrer" to a plaintiff's evidence].)

With this standard in mind, we turn first to Plaintiffs' operative complaint.

### A. *First Amended Complaint (FAC)*

Plaintiffs alleged R. Hayward, Tabush, and E. Alvarez, as employees of VEC, had access to Plaintiffs' "proprietary and confidential information," including "confidential customer lists, confidential proprietary procedures, processes, and methods for operation of a hazardous waste cleanup business, confidential pricing information, confidential approved facilities, vendors, and subcontractors information and their negotiated pricing (hereinafter, 'Trade Secrets')[.]" Plaintiffs further alleged these employees misappropriated their Trade Secrets and other confidential information by operating a competing business servicing both current and future customers of ELI and/or FRS.

The FAC also alleged R. Hayward, Tabush, and E. Alvarez had access to the "personal property" of ELI and/or FRS including "specialty custom-made forms and templates," "customers' data info, manuals, and other documents, as well as various hazardous waste cleanup supplies." Plaintiffs alleged R. Hayward "stole the supplies and the forms, E. Alvarez stole the forms, and M. Tabush broke into a locked office and stole" customers' information and other proprietary information; and then used this information to "divert[ ] current and future business of Plaintiffs" to a competitor.

4

Plaintiffs further alleged R. Hayward took personal property belonging to ELI and/or FRS, used it while employed by VEC to conduct a competing business, and returned the property, some of which he damaged, when he left VEC in early January 2016; and that R. Hayward and others named in the FAC, including former defendant Emiterio Mark Alvarez (M. Alvarez),[3] created a new business[4] and, between September 2013 and August 2014, diverted projects from ELI and/or FRS to this competitor.

Plaintiffs asserted causes of action for conversion, misappropriation of Trade Secrets, and unfair competition against Defendants (i.e., Hayward, Tabush, E. Alvarez, and S. Alvarez). ELI and FRS separately asserted causes of action for trespass to chattels and intentional interference with prospective economic advantage against Defendants; and VEC, for itself only, asserted a breach of contract cause of action against former employees R. Hayward, Tabush, and E. Alvarez. Plaintiffs sought punitive damages against Defendants on each of their tort-based causes of action.

In their first cause of action for conversion, Plaintiffs alleged Defendants "substantially interfered" with Plaintiffs' personal property including custom-made forms and templates and property used in the cleanup of hazardous waste by wrongfully taking possession of such property and/or destroying it. Plaintiffs sought compensatory damages "in excess of $260,000" (emphasis omitted).

---

[3]     There is no relation between E. Alvarez and former defendant M. Alvarez.

[4]     The FAC refers to this business as "Enviro Pros, LLC" and "Enviropros." For consistency, we will refer to this former defendant as "Enviropros."

In their second cause of action for trespass to chattels, ELI and FCS alleged Defendants intentionally and substantially interfered with their personal property including "first responder vehicles with special equipment," cell phones and computers, and hazardous waste cleanup gear. ELI and FCS sought compensatory damages "in excess of $282,400" (emphasis omitted).

In their third cause of action for interference with prospective economic advantage, ELI and FRS alleged Defendants intentionally interfered with Plaintiffs' economic relationships with current and future customers. ELI and FRS sought compensatory damages "in excess of $37,550,000" (emphasis omitted); and injunctive relief and "other remedies" "[i]n the alternative."

In their fourth cause of action for misappropriation of Trade Secrets, Plaintiffs alleged Defendants improperly acquired, disclosed, and/or used Plaintiffs' Trade Secrets; that Defendants' misappropriation was "willful and malicious"; that they were damaged "in excess of $37,550,000" (emphasis omitted); and that they also were entitled to injunctive relief and "other remedies."

VEC in its fifth cause of action asserted R. Hayward, Tabush, and E. Alvarez separately breached their written confidentially agreements by disclosing "proprietary information of Plaintiffs," causing Plaintiffs to sustain damages "in excess of $37,550,000" (emphasis omitted).

Finally, Plaintiffs alleged in their unfair competition cause of action (Bus. & Prof. Code, § 17200 et seq.) (UCL) that Defendants engaged in unfair competition and unlawful business practices as described in their other causes of action. Plaintiffs sought injunctive relief, restitution of all monies, and disgorgement of any profits made by Defendants.

6

**B. *Plaintiffs' Case-in-chief***

Jon Bennett, the president of FRS and VEC and former president of ELI, testified VEC hired R. Hayward as a field technician in about 2008 and subsequently promoted him to project manager. As project manager, R. Hayward met with regulators and acted as a contact person for Plaintiffs' current and future customers. R. Hayward worked for VEC until January 8, 2016.

On the last day of his employment, R. Hayward returned his company truck, cell phone, and fuel card, and cleaned out his office. Bennett saw R. Hayward in possession of a binder containing "[h]undreds of business cards" of "customers and potential customers" of ELI and/or FRS. Written on some of these cards was customer information including waste streams and rates. Bennett occasionally had used these business cards to call customers of ELI and/or FRS. Bennett took possession of the binder and another manual, locked them inside R. Hayward's former office, and drove R. Hayward home.

Tabush worked as a field technician under R. Hayward's supervision. Bennett testified that a few days after R. Hayward left VEC, Tabush used a "knife" to break into R. Hayward's office and retrieve the binder, which he then returned to R. Hayward, along with two of Plaintiffs' manuals.

Tabush testified that he and other technicians who worked for VEC were "trained" to use a "bread knife" to unlock the office door of R. Hayward, where they stored "specialized equipment" used in the cleanup of hazardous waste. Tabush estimated he used the bread knife "over a hundred times" to unlock the door, including in the middle of the night when responding to an emergency. Technicians referred to the knife as "Jimmy keys," named for

7

another VEC employee. Tabush witnessed technicians using the knife to gain entry into R. Hayward's office in the presence of VEC administrators.

Tabush further testified that a few days after R. Hayward left VEC, he asked Tabush to retrieve the binder and any other "personal items." The following day, Tabush went to work at about 5:00 a.m., his usual start time. Using the bread knife, he unlocked R. Hayward's office door and retrieved the binder and two "manuals" with R. Hayward's name printed on them. Tabush placed these items in his truck and dropped them off at R. Hayward's home after work.

Bennett fired Tabush a few days later for breaking into R. Hayward's former office and taking the binder and two manuals. Tabush signed VEC's confidentiality agreement at the same time he was terminated.

VEC employee Jennifer Lynn Crompton testified she had worked in the waste management business for 39 years. Her duties at VEC included training, "compliance issues," human resources, and maintaining and updating ELI's "standard operating procedure[s]" (SOPs).

Crompton was questioned about trial exhibit 12, a September 9, 2015 e-mail from R. Hayward to M. Alvarez that included 21 of ELI's SOPs.[5] She testified she spent more than 100 hours researching and writing these SOPs, mostly in 2008 and 2009 when she first began working at VEC. She added

_____

[5] The SOPs Compton prepared for ELI were admitted into evidence. Outside the presence of the jury, the court noted that "every single" one of these documents had "an indication that they're confidential because the lawyers stamped 'confidential' " on them during discovery; and that this designation (actually, "Confidential -- Attorneys' Eyes Only") was "very prejudicial" and "very confusing for the jury." The record shows the court admonished the jury to ignore the confidential stamp on these and other documents; and requested the parties to meet and confer and "prepare an appropriate stipulation" to resolve this issue.

companies in the waste management business have different SOPs, and shared her belief that ELI's SOPs were "proprietary." Crompton confirmed that none of the SOPs she prepared were used by FRS and/or VEC, and none were copyrighted or trademarked.

Crompton estimated that "[e]asily" more than 75 percent of the research she conducted to prepare the SOPs were from public sources, including a Web site maintained by the Department of Toxic Substances Control (DTSC).[6] Crompton also used templates from a computer program Plaintiffs had purchased for "[s]everal hundred dollars" to generate many of ELI's SOPs. She acknowledged that ELI sometimes included its SOPs in bids to customers as evidence of ELI's "health and safety program[s]."

Karen Rivera testified VEC hired her as office manager in 2007. Her responsibilities included handling accounts payable and receivable, and managing and negotiating vender pricing. Rivera estimated that beginning in about 2014, the volume of business from about 20 or 30 ELI customer accounts she managed "dropped tremendously," with some of these customers no longer doing any business with ELI. She further estimated ELI at the time had a "couple hundred" customers; that she did not know why ELI was experiencing a reduction in business from these 20 or 30 customers; that for many other customer accounts she managed there was no drop off in business; and that during this same time period ELI (and FRS) also obtained new customers. Rivera believed ELI's customer account information was "confidential," as it included the type of waste each generated and the services needed.

---

[6] The DTSC Web site also includes such information as a company's hazardous waste identification number, contact information, the waste "actually generated" by the company, and where that waste is disposed of or stored.

9

Rivera also negotiated vender prices for waste storage that, for one reason or another, FRS could not handle. She believed these prices were "[c]onfidential," as they were based in part on the volume of waste ELI shipped to a vendor. Rivera added that sometimes the prices ELI paid a vendor took "weeks" or "months" to negotiate, and would remain in "effect and under contract for up to three years."

Rivera worked with R. Hayward for years. Beginning in 2015, she saw him "carrying two cellphones," which she found "unusual" because in the past he had had only one cell phone and VEC issued phones to all of its employees. She also observed R. Hayward would leave the room when his "personal" cell phone rang; and that he would brag "about how much money he had," while before he would "always" talk about "money being tight."

R. Hayward testified he signed a confidentiality agreement with VEC on April 1, 2008, which governed that company's "policies" and "recipes." While employed by VEC between 2008 and January 2016, he never received any policies or "recipes" specific to this company.

R. Hayward admitted signing a partnership agreement with Enviropros on or about August 28, 2015, although he claimed he was never paid under that agreement. He also admitted working for Enviropros as an "[o]utside consultant" while employed by VEC, testifying he did so because M. Alvarez was a "friend" who needed help getting "situated."

R. Hayward was questioned about myriad e-mails with potential customers of Enviropros and/or M. Alvarez and others at Enviropros in fall 2015 and early January 2016. By way of example, on November 18, 2015, R. Hayward wrote M. Alvarez regarding a bid to a potential customer of Enviropros, stating: "Let's not shortchange ourselves. Enviro Pros needs to be profitable. Let's go with $7,800 per day"; and adding, " 'This still keeps us

a thousand per day under the other bid.' " When asked at trial about this e-mail, R. Hayward testified, "I don't recall that. I don't recall." However, M. Alvarez testified the " 'other bid' " referenced in this e-mail was by ELI.

As another example, R. Hayward on December 3, 2015, sent an e-mail to Enviropros regarding a potential job in Los Angeles, asking that someone from Enviropros drive to the jobsite and take photographs so that R. Hayward could "prepare a quote on behalf of Enviro Pros." He also wrote, "If not, I can go there myself, but I would be in [an] ELI truck, which I would rather not do."

R. Hayward was questioned about exhibit 12, the September 9, 2015 e-mail he sent to M. Alvarez that included 21 of ELI's SOPs. In this e-mail, R. Hayward wrote, "Here you go, doctor these up [and] put Enviropros Label[s] on them, edit as necessary. They are ours now." R. Hayward had no recollection of this e-mail.

M. Alvarez testified he met R. Hayward while doing business with ELI. They began discussing a possible business arrangement in February 2015, and entered into the "partnership agreement" on August 28, 2015. Once the agreement was signed, M. Alvarez expected R. Hayward would give VEC two weeks' notice and join Enviropros. Starting August 28, Enviropros paid R. Hayward $2,500 a month for a few months, until it became clear that R. Hayward intended to remain at VEC. Enviropros thereafter only paid R. Hayward a "commission" for deals he brokered for the company.

M. Alvarez also was questioned about exhibit 12. He testified that none of these attachments were designated as " 'trade secrets' " or " 'confidential information' " of ELI; that, in any event, he never used any of these documents; and that he already was in possession of many of them as a

result of his attendance at an ELI " 'HAZWOPER[7] training [course] around 2007.' " M. Alvarez paid for this course, during which he received a binder containing some of the same documents attached to exhibit 12. ELI then had placed no restrictions on what M. Alvarez could do with these sample SOPs, and none were marked confidential. M. Alvarez believed all 21 of the SOPs in exhibit 12 were available on the Internet.

E. Alvarez testified he began working in sales for VEC sometime in 2014, he voluntarily left the company on October 3, 2015, and thereafter he worked in sales for a series of waste management companies until he started his own business in 2018. Two days before he left VEC, E. Alvarez used his ELI e-mail address to send what Plaintiffs claimed was their "customer" list to his personal e-mail account. The seven-page list, marked as trial exhibit 114 and received into evidence, included a company name, and the name, e-mail address, and telephone number of the company's contact person.

E. Alvarez testified he began creating this list or "spreadsheet" in 2010, years before he went to work for VEC. The list was a work-in-progress, as E. Alvarez would supplement it including while employed by VEC. E. Alvarez estimated the list was about three-quarters complete when he started working for VEC in 2014; that the list was actually a compilation of "companies" in the waste management business and not "customers" of ELI and/or FRS; and that he compiled the list through his own "effort[s]," including "cold[-]call[ing]" "compan[ies]," obtaining their contact information

---

7    The acronym "HAZWOPER" stands for "Hazardous Waste Operation and Emergency Response Plan."

through the "DTSC website,"[8] and visiting these companies in-person, where he sometimes met with company representatives and other times just took their business cards. E. Alvarez believed the list belonged to him and not Plaintiffs or any of his previous employers.

S. Alvarez testified she and her daughter Samantha Baez started a waste management business in 2013 called Amber Solutions. The business mostly assisted companies with obtaining EPA numbers, which were required to keep track of hazardous waste, and also provided accounting services. As time went on, the company also helped businesses with waste disposal on a "very small scale." By early 2016, Amber Solutions was regularly communicating with Enviropros to do waste pickups for a few customers.

S. Alvarez testified she used the DTSC Web site to obtain information about a company and solicit business on behalf of Amber Solutions. She added the Web site contained a great deal of information about a company including its waste streams, and in some cases "pricing."

C. Hayward testified she was the controller for HEC, a company her husband R. Hayward started in March 2016 to consult on "hazardous waste matters." She admitted her husband acted as a consultant for Enviropros, including while he was employed by VEC. C. Hayward recalled in December 2015 she may have accidently "shredded" a check Enviropros had sent her husband, but otherwise could not recall seeing or receiving any other checks from Enviropros for her husband's consulting work.

---

[8] Like other witnesses, E. Alvarez found the DTSC Web site to be an important "public resource," which contained substantially more company information than his seven-page list.

## C. *The Nonsuit Motions*

Toward the end of their case-in-chief, Plaintiffs called their damages expert, Anthony Ghosn.  As discussed *post*, during his testimony the trial court excused the jury and conducted an Evidence Code section 402 hearing to determine whether Ghosn's opinions were admissible.  As a result of that hearing, the court excluded Ghosn's opinions, finding he was qualified to testify as an expert "about business valuation and financial matters" generally, but not about Plaintiffs' alleged damages in this case.  Thereafter the court heard and subsequently granted the four nonsuit motions of Hayward, Tabush, E. Alvarez, and S. Alvarez on all causes of action.

## II.  DISCUSSION

Plaintiffs' primary contention on appeal is that the trial court erred in granting Defendants' nonsuit motions, including without first allegedly giving them the opportunity to reopen and submit additional evidence in their case-in-chief.  Before reaching these issues, however, we first must decide whether the court erred in making various evidentiary rulings, as Plaintiffs also contend, inasmuch as the exclusion or admission of such evidence is a factor in determining whether nonsuit was proper.

### A. *Exclusion of Plaintiffs' Waste Management Expert*

Plaintiffs contend the trial court erred when it excluded their waste management expert, Peter Jaramillo.  We disagree.

### 1.  Additional Background

The trial date in this case was continued from April 27, 2020, to June 1, 2021, due to the COVID-19 pandemic.  On March 29, 2021, defense counsel e-mailed Plaintiffs regarding possible deposition dates for Plaintiffs' experts and, on April 8 when Plaintiffs did not respond, set Jaramillo's deposition for May 7.  Thereafter, deposition dates were scheduled for the defendants'

14

experts. In mid-April, Plaintiffs sought to postpone Jaramillo's deposition, noting *counsel* was unavailable on May 7.

Jaramillo's deposition was taken off calendar on May 6, and the date of May 17 was chosen, after the parties met and conferred and Plaintiffs represented defendants could " 'plan on' " this date. However, after the defendants served the May 17 deposition notice, Plaintiffs again sought to postpone Jaramillo's deposition, stating he was "traveling" and his deposition would have to wait until the week of May 24.

Plaintiffs thereafter served an objection to the May 17 deposition notice to certain categories of documents for production, but not as a result of Jaramillo's unavailability. The defendants convened the deposition on May 17 without Jaramillo or Plaintiffs appearing, or Plaintiffs producing any documents responsive to the production requests.

### 2. Analysis

A trial court "*shall* exclude from evidence the expert opinion of any witness" if a party has "unreasonably failed" to "[m]ake that expert available for a deposition . . . ." (Code Civ. Proc., § 2034.300, subd. (d), italics added.)[9] "We review the trial court's reasonableness determination under section 2034.300 for abuse of discretion." (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950 (*Boston*).)

We conclude the trial court properly exercised its broad discretion in excluding Jaramillo as an expert based on substantial evidence showing Plaintiffs "unreasonably failed" to make him available for a deposition. (See § 2034.300, subd. (d); *Boston, supra*, 170 Cal.App.4th at p. 950; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631 [substantial evidence is

---

9 Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

15

that which is "of ' "ponderable legal significance," ' ' "reasonable in nature, credible, and of solid value" ' "].) Indeed, waiting until a week before the June 1, 2021 trial date to make him available in a case Plaintiffs filed in 2016, after Plaintiffs twice sought to postpone his deposition and the parties—after meeting and conferring—had settled on the date of May 17, amply supports the court's unreasonableness finding. In further support, it appears Plaintiffs never produced any documents responsive to the production requests in the May 17 deposition notice.

Our Supreme Court has recognized that the need for pretrial discovery is greater for expert witnesses than for ordinary fact witnesses because the opponent must prepare to cope with the expert's specialized knowledge. (*Bonds v. Roy* (1999) 20 Cal.4th 140, 147.) Included in the detailed procedures for discovery pertaining to experts is the provision allowing a party to demand production of any discoverable reports and writings made by an expert in the course of preparing his or her opinions. (§ 2034.210, subd. (c).)[10] "This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area." (*Bonds*, at pp. 146-147.) Waiting until the week before trial to produce Jaramillo (and any of his "reports and writings") undermines the need for and importance of pretrial discovery of an expert witness. (See § 2034.300, subd. (c); *Bonds*, at p. 147.) We thus reject this claim of error.

---

[10] "Any party may also include a demand for the mutual and simultaneous production for inspection and copying of all discoverable reports and writings, if any, made by any expert described in subdivision (b) in the course of preparing that expert's opinion." (§ 2034.210, subd. (c).)

**B.** *Exclusion of Plaintiffs' Damages Expert's Opinions*

Plaintiffs contend the trial court also abused its discretion in excluding the opinions of expert Anthony Ghosn. We again disagree.

**1. Additional Background**

Toward the end of their case-in-chief, Plaintiffs called Ghosn as their only damages expert. He initially testified regarding his methodology to calculate Plaintiffs' damages in this case. His methodology did not "assign[ ] any fault to anyone," but instead used what he referred to as a "but for" approach, "which means if not for the allegations here in this matter, these quantifications would be the damages. [¶] So in other words, if the allegations are true, we believe these are the losses, the appropriate losses, the profits, related cash flows and related costs." To calculate these "losses," Ghosn relied on "[t]hird-party independent reports on industry trends in the hazmat and recycling and environmental consulting industries, financials from the plaintiff[s'] companies, and projections from the plaintiff[s'] companies through plaintiff[s'] CPA firm." Ghosn then compared the industry trend and Plaintiffs' projected performance to Plaintiffs' actual performance and, using additional variables, found the difference to be Plaintiffs' actual damages.

The record shows the trial court repeatedly sustained Defendants' objections to Plaintiffs' attempts to admit both Ghosn's expert report[11] and his opinions concerning Plaintiffs' damages. Plaintiffs then requested a sidebar. The court instead excused the jury. It noted Plaintiffs had failed to lay an adequate foundation for Ghosn's opinions, explaining: "What I haven't heard from this witness is what he did to determine that the graph of the

---

[11]    In sustaining the objections to Ghosn's report, the court commented the report was hearsay and it was "unusual" for a party to seek admission of an expert report.

17

industry, which wasn't followed by the graph of [Plaintiffs'] performance[,] was due to anything that the defendants did.  That's the foundation that I don't see."

The trial court recognized there could be "any number of reasons" why Plaintiffs' performance fell below industry trends, noting this was the "post hoc ergo propter hoc fallacy."  (See *Western States Petroleum Assn. v. South Coast Air Quality Management Dist.* (2006) 136 Cal.App.4th 1012, 1020, fn. 17 ["The logical fallacy of *post hoc ergo propter hoc* assumes one event is the cause of another merely because the first event precedes the other"].)  The court inquired whether Plaintiffs had another expert who could "tie" their "financial losses to the defendant[s'] conduct."  Plaintiffs responded they had "the facts" and Ghosn's opinions, and that it was the "province of the jury" to make the "factual connection" between Plaintiffs' losses and Defendants' conduct.

The trial court next gave as an example one possible method for calculating damages.  It explained that, if Plaintiffs proffered evidence of "identifiable customers" who "went from the plaintiffs to any of the defendants," an expert then could quantify the "losses that flowed from the loss of those customers"; and that it would then be up to the jury to "accept . . . or reject" this evidence as damages.  While Plaintiffs agreed there needed to be a "nexus" between their losses and Defendants' conduct, they argued Ghosn provided this connection, albeit "on a more global level" than the "customer-by-customer analysis" suggested by the court.

The trial court in response conducted an Evidence Code section 402 hearing.  At its conclusion and after argument by counsel, it excluded Ghosn's opinions regarding Plaintiffs' damages, finding they were based on industry trends and the fact Plaintiffs "lost revenue relative to [their] own projections"

18

without a foundation that those losses were "tied" to anything Defendants had done.

## 2. Guiding Principles

It is axiomatic that a plaintiff cannot recover damages from a defendant unless the defendant's conduct was the proximate cause of those damages. (See *Azcona v. Tibbs* (1961) 190 Cal.App.2d 425, 428 [discussing proximate cause in connection with a negligence cause of action].) Civil Code section 3333 requires a causal connection between the tortious conduct of a defendant and the resulting injury to a plaintiff: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment *proximately caused* thereby, whether it could have been anticipated or not." (Civ. Code, § 3333, italics added.) "The necessary causal connection between the tortious conduct and the injury must be shown, and in general the rules of legal or proximate cause that determine liability also determine whether the defendant shall be liable for particular items of injury or loss." (6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1721, p. 1115.)

" 'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' " (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 353.)

Under California law, "trial courts have a substantial 'gatekeeping' responsibility" in determining whether a matter relied on by an expert is reliable so as to assist the trier of fact or is speculative, thus rendering the expert's opinion inadmissible. (*Sargon Enterprises, Inc. v. University of*

19

*Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*).)  Evidence Code section 801 provides in relevant part:  "If a witness is testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

" 'An expert opinion has no value if its basis is unsound.' " (*Sargon, supra*, 55 Cal.4th at p. 770.)  Under Evidence Code section 801, subdivision (b), the " 'matter relied on must provide a reasonable basis for the particular opinion offered, and . . . an expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon*, at p. 770.)  The trial court therefore "acts as a gatekeeper" under Evidence Code section 801, subdivision (b) to exclude speculative or irrelevant expert opinion.  (*Sargon*, at p. 770.)  " ' "Exclusion of expert opinions that rest on guess, surmise, or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony:  will the testimony assist the trier of fact to evaluate the issues it must decide?" ' " (*Ibid.*)

We apply an abuse of discretion standard in reviewing a trial court's ruling admitting or excluding expert testimony.  (*Sargon, supra*, 55 Cal.4th at p. 773.)  "[E]videntiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226 (*Alexander*).)  "A court abuses its discretion if its ruling is ' "so irrational or arbitrary that no

20

reasonable person could agree with it." ' . . . 'It is the appellant's burden on appeal to show the trial court abused its discretion.' " (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 154 (*Sanchez*).)

### 3. Analysis

We conclude the trial court's ruling to exclude Ghosn's opinions was a proper exercise of its discretion. (See *Sanchez, supra*, 8 Cal.App.5th at p. 154.)

First, we note the trial court waited until after the Evidence Code section 402 hearing to make its ruling. This allowed the parties ample opportunity to question Ghosn regarding the basis for his opinions, and the court to discern whether Plaintiffs had laid an adequate foundation for their admission. (See *Alexander, supra*, 23 Cal.App.5th at p. 226.) It is clear from the record the court took a careful and thoughtful approach in performing its role as "gatekeeper" under Evidence Code section 801, subdivision (b), ensuring the matter relied on by Ghosn provided a reasonable basis to assist the jury in deciding whether Defendants' alleged tortious conduct in fact harmed Plaintiffs and if so in what amounts. (See *Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302-1303 (*Lueter*) [recognizing the legal distinction between proving the *fact* of damages as opposed to proving the *amount* of damage, and concluding "[t]o recover in tort, the plaintiff must prove the *fact* of proximately caused injury with reasonable certainty" (italics added)].)

Second, the record supports the trial court's finding that Ghosn's damages analysis was based on " ' "assumptions of fact without evidentiary support." ' " (See *Sargon, supra*, 55 Cal.4th at p. 770.) Indeed, Ghosn testified his "but for" methodology in calculating damages was "probabilistic"

21

and based on the assumption that a "group of people" were "responsible for [Plaintiffs] not getting what [they] expected." However, under this "approach" Ghosn did not analyze whether *Defendants* were that "group of people," including whether *Defendants* had taken any customers away from ELI and/or FRS; whether Plaintiffs' profits, as a result of *Defendants'* tortious conduct, had declined and if so in what amounts; or whether *Defendants* were unjustly enriched at Plaintiffs' expense. Instead, his approach was a "forensic exercise" that used industry trends and Plaintiffs' projections of profits from their CPA to calculate purported losses based on Plaintiffs' actual financial performance. (See *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 62 ["Damages which are remote, contingent, or *merely possible* cannot serve as a legal basis for recovery" (italics added)].)

As the trial court reiterated on multiple occasions in refusing to admit Ghosn's opinions, there could be any number of reasons why Plaintiffs' profits decreased. We agree with the court that the matter on which Ghosn relied to show with "reasonable certainty" the "fact of proximately caused injury" to Plaintiffs was speculative, rendering his opinions inadmissible. (See *Lueter, supra*, 94 Cal.App.4th at pp. 1302-1303 ["[W]here the *fact* of proximately caused injury is not proven with reasonable certainty, the plaintiff cannot recover regardless of how much evidence was introduced to show the measure of the recovery sought by the plaintiff" (italics added)]; see also *Sargon, supra*, 55 Cal.4th at p. 770; accord, *Kaney v. Custance* (2022) 74 Cal.App.5th 201, 212 [noting causation must be established by "nonspeculative evidence" and may be decided as a question of law if " ' "there is no room for a reasonable difference of opinion" ' "].) We thus conclude the court, in its role as "gatekeeper," properly excluded Ghosn's opinions.

## C. *Exclusion of Documents*

Plaintiffs next contend the trial court erred in first ruling to admit, then later revisiting its decision and deciding to exclude, documents attached to three e-mails between R. Hayward and M. Alvarez in September 2015. We disagree.

### 1. Additional Background

During the testimony of M. Alvarez, the trial court overruled Defendants' foundation objection to the admission of exhibit 12, which as noted included 21 of ELI's SOPs as attachments. During this same testimony the court admitted without objection exhibit 13, an e-mail R. Hayward sent M. Alvarez on September 9, 2015 that included VEC's 74-page "Alcohol and Controlled Substances Policy"; and exhibit 15, a September 11, 2015 e-mail M. Alvarez sent R. Hayward that included five ELI documents M. Alvarez had reworked for use by Enviropros.

Tabush subsequently filed a motion asking the trial court to reconsider its admission of the attachments to exhibits 12, 13, and 15, arguing that M. Alvarez had not authenticated any of the documents, which collectively numbered hundreds of pages. Tabush noted that, while M. Alvarez authenticated the e-mails themselves, he had spent just a few "seconds" on the witness stand reviewing the attachments; and thus, had not verified that they were the same as the ones he had received or sent electronically in the e-mails with R. Hayward.

The record shows the trial court and the parties mistakenly believed Defendants had also objected to the admission of the attachments in exhibits 13 and 15. The court agreed with Tabush that M. Alvarez had spent "only a few seconds" reviewing the attachments and that it had become clear on cross-examination he "really wasn't at all sure that those were the documents

23

that were received" electronically.  The court noted the jury had not yet reviewed any of the attachments, and some of the documents in exhibit 12 had already been admitted during Crompton's testimony.  After additional argument, it excluded the remaining attachments to exhibits 12, 13, and 15 for lack of foundation, but not the three e-mails themselves.

## 2.  Guiding Principles and Analysis

"Evidence that lacks foundation is inadmissible, and a court abuses its discretion when it admits it."  (*Valentine v. Plum Healthcare Group, LLC* (2019) 37 Cal.App.5th 1076, 1090 (*Valentine*).)  Exhibits 12, 13, and 15 were "writings" (Evid. Code, § 250)[12] that could not be admitted without a proper foundation (*id.*, § 1401, subd. (a)).[13]  To authenticate a writing, its proponent must introduce "evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is."  (*Id.*, § 1400.)

Here, the record shows M. Alvarez took "only a few seconds" to review the hundreds of pages collectively attached to exhibits 12, 13, and 15, and later admitted on cross-examination he could not be sure that the documents attached to these exhibits were the same ones that had been included in the September 2015 e-mails he exchanged with R. Hayward.  The trial court thus properly exercised its discretion when it found there was no foundation for

---

[12]  " 'Writing' means handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored."  (Evid. Code, § 250.)

[13]  "Authentication of a writing is required before it may be received in evidence."  (Evid. Code, § 1401, subd. (a).)

the admission of the attachments, other than those previously received during Crompton's testimony.  (See Evid. Code, § 1401, subd. (a); *Valentine, supra,* 37 Cal.App.5th at p. 1090.)

Plaintiffs nonetheless contend the trial court erred because there was "affirmative testimony" provided by M. Alvarez "that the later-stricken *emails*" were authentic.  (Italics added.)  However, as noted the court did *not* exclude the e-mails themselves, including exhibit 12 in which R. Hayward suggested M. Alvarez "doctor up" the attachments and put "Enviropros Label[s] on them."

In any event, we note the court made its ruling *without prejudice* to allow Plaintiffs to lay a proper foundation for admission of the remaining attachments.  However, it does not appear that Plaintiffs ever recalled M. Alvarez or another witness to lay this foundation.  For this additional reason we reject this claim of error.

### D.  *Nonsuit*

Reaching the overarching issue in this case, Plaintiffs raise a series of contentions in support of their claim that the trial court erred in granting Defendants' nonsuit motions on all causes of action.

### 1.  Guiding Principles

"A trial court may grant a motion for nonsuit if the plaintiff's evidence would not support a jury verdict in the plaintiff's favor."  (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1013.)  We review de novo an order granting nonsuit, applying the same standard as used by the trial court.  (*Nally, supra*, 47 Cal.3d at p. 291.)

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in [the plaintiff's] favor."  (*Nally, supra*, 47 Cal.3d at

25

p. 291.)  Evidence is legally insufficient when no substantial evidence exists tending to prove each element of the plaintiff's claim or claims.  (*Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1488 (*Joyce*).)  "A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' "  (*Nally*, at p. 291.)

In determining whether the plaintiff's evidence is sufficient, the court may not weigh the evidence or consider witness credibility, but must accept as true the evidence most favorable to the plaintiff and disregard conflicting evidence.  (*Nally, supra*, 47 Cal.3d at p. 291.)  The court must interpret the evidence most favorably to the plaintiff and draw every reasonable inference, and resolve all presumptions, conflicts, and doubts, in the plaintiff's favor.  (*Ibid.*; accord, *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.)

A nonsuit may be affirmed on any ground specified in the motion, whether or not the trial court granted the motion on that ground.  (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 92-94; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1542.)  A nonsuit also may be affirmed on an unspecified ground only if it is clear the defect is one which could not have been remedied had the motion called the defect to the plaintiff's attention.  (*Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 305-306.)

### 2.  Fact of Injury and Resulting Damages

As we have found, the trial court properly excluded the opinions of Ghosn, Plaintiffs' only damages expert, as a result of his reliance on speculative and conjectural matter that failed to connect the alleged tortious conduct of Defendants to the fact of damage allegedly suffered by Plaintiffs.[14]

_____

14    As noted, the court also excluded Jaramillo, Plaintiffs' waste management expert.  Plaintiffs on appeal contend Jaramillo's exclusion was

26

(See *Lueter, supra*, 94 Cal.App.4th at pp. 1302-1303.) The question next becomes whether, without Ghosn's opinions, nonsuit was proper on Plaintiffs' tort-based and breach of contract causes of action. The answer is yes.

### a. Other Witness Testimony

As noted, Rivera managed some of ELI's customer accounts. In about 2014, she noticed business from about 20 or 30 of these accounts "dropped tremendously," and that some of these customers stopped doing business with ELI altogether. In 2015, she observed R. Hayward carrying two cellphones, and noticed he would leave the room when his personal cell phone rang. He also no longer talked about money being "tight."

Viewing, as we must, this evidence in the light most favorable to Plaintiffs (see *Nally, supra*, 47 Cal.3d at p. 291), we conclude Rivera's testimony is legally insufficient to support a finding that ELI suffered harm caused by Defendants. (*Ibid.*; *Joyce, supra*, 198 Cal.App.4th at p. 1488.) Neither Rivera nor any other witness called by Plaintiffs, including Bennett, the president of FRS and VEC and former president of ELI, connected R. Hayward's conduct, or the conduct of the remaining Defendants, to the decrease in *ELI's* business during this time frame.[15] Nor did any of these

---

prejudicial because his testimony about the "value" of Plaintiffs' "operating procedures" allegedly "would have directly addressed" the issues raised by the court when it granted Defendants' nonsuit motions. But there is nothing in the record to support this contention, including, by way of example only, Jaramillo's "reports and writings" (see § 2034.300, subd. (c)) and/or an offer of proof describing his purported valuation testimony. Plaintiffs thus have failed to show his exclusion from evidence, even if error, was prejudicial. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [error justifies reversal in a civil action only if it is reasonably probable a different result would have been reached absent the error].)

15    We note Rivera's testimony regarding a drop off in business and "change[s]" in customer relationships was limited to ELI.

20 or 30 customers testify they used to do business with ELI but, due to Defendants' conduct (and R. Hayward's in particular), moved to a competitor (i.e., Enviropros). In addition, Rivera testified that for many other customers of ELI there was no drop off in business, and that ELI (and FRS) also added customers during this same time frame.

Even clearing this legal hurdle, Plaintiffs also offered no evidence that a "reasonable basis" was used to compute ELI's purported damages, including lost revenues and/or profits, as a result of this drop off in customer accounts managed by Rivera. (See *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 (*GHK*) [noting when the "*fact* of damages is certain," the "law requires only that some reasonable basis of computation of damages be used"].)

Plaintiffs, however, contend that the trial court erred in granting nonsuit because "juries are empowered to quantify damages[ ] even when a plaintiff's case in chief does not provide a specific quantification." In support, Plaintiffs further contend the court had a "fundamental misunderstanding" of the law by allegedly requiring them to "*quantify damages to the dollar*" on "each cause of action" to avoid a nonsuit.

Plaintiffs have the proverbial cart before the horse. Before Plaintiffs could recover damages, they first had to establish (by substantial evidence) that they suffered harm caused by Defendants. (See *Lueter, supra*, 94 Cal.App.4th at pp. 1302-1303; *GHK, supra*, 224 Cal.App.3d at p. 873.) Where the "*fact* of proximately caused injury is not proven with reasonable certainty, the plaintiff cannot recover regardless of how much was introduced to show the measure of the recovery sought by the plaintiff." (*Lueter*, at p. 1303, italics added.)

Plaintiffs have failed to offer substantial evidence to show the *fact* of damage caused by Defendants. (See *Nally, supra*, 47 Cal.3d at p. 291; *Joyce, supra*, 198 Cal.App.4th at p. 1488.) We thus reject their two-sentence argument (in their 72-page brief) that this showing was "amply established." Nor did the trial court make such a finding, as they also argue, when they claim the court "admitted" Plaintiffs had " 'shown inferentially' " they had "lost business."[16]

### b. Nominal Damages

Plaintiffs also contend the trial court erred in granting a nonsuit because it "ignored the possibility of *nominal* damages." "Nominal damages" describes a claim where there are no actual damages, but the law nevertheless recognizes a technical invasion of a right or duty. (Civ. Code, § 3360.)[17] "Nominal damages are usually awarded where there is an invasion of a legally protected interest that does not result in actual damage. The invasion is 'injury without damage,' and an award of damages is not the object of the action, which is brought to vindicate the right or interest. The

---

[16] Our review of the record shows the court made this statement when discussing Rivera's testimony about *ELI's* purported loss of business and revenues over a certain time period, noting a plaintiff could rely on inferences -- when supported by facts -- that such losses were caused by the acts of a defendant. What Plaintiffs neglect to mention is that the court went on to state that Rivera's testimony "wasn't tied in any manner to any action by the defendants"; that "there's no nexus between the alleged injury suffered by Plaintiff[s] and what the defendants did, and nothing is quantified to any extent"; and that the "vague testimony of, [']well, business declined during those years[,'] " was insufficient because there "could be any number of reasons that business declined."

[17] "When a breach of duty has caused no appreciable detriment to the party affected, he [or she] may yet recover nominal damages." (Civ. Code, § 3360.)

interest is recognized and protected by the award of nominal damages, together with costs." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1713, p. 1104.)

We conclude Plaintiffs were not entitled to an award of nominal damages in this case. First, in a tort action " 'nominal damages to vindicate a technical right cannot be recovered . . . where no actual loss has occurred,' " such as when a plaintiff's evidence of "prospective profits was too speculative to form a basis of permissible recovery." (See *Engle v. City of Oroville* (1965) 238 Cal.App.2d 266, 274.) As we have noted, Plaintiffs have failed to proffer substantial evidence to show they suffered harm based on the acts of Defendants, and to quantify their resulting damages, if any, on nonspeculative grounds.

Second, nominal damages were not the "object of [Plaintiffs'] action" in this case, as they sought compensatory damages on all causes of action other than their UCL claim, where damages are not recoverable. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 (*Korea Supply*) ["A UCL action is equitable in nature; damages cannot be recovered"]; 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1713, p. 1104.)

Indeed, Plaintiffs sought damages in excess of $260,000 and $282,400 on their first and second causes of action for conversion and trespass to chattels, respectively. And they sought damages in excess of $37.55 million on their causes of action for interference with prospective economic advantage, misappropriation of Trade Secrets, and breach of contract. Thus, in bringing this action Plaintiffs were not seeking to protect a property right or vindicate some other interest where an award of nominal damages would have been appropriate. (See Civ. Code, § 3360.) There was no error in refusing to award Plaintiffs nominal damages.

30

### 3. Conversion and Trespass to Chattels

Plaintiffs contend they presented "more than enough evidence" to support each element of their conversion and related trespass to chattels causes of action. We disagree.

A common element of both causes of action is the necessity of actual damages. (See, e.g., *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150-1151 (*Voris*) [among other essential elements conversion requires resulting damages]; *Greka Integrated, Inc. v. Lowrey* (2005) 133 Cal.App.4th 1572, 1581 [" ' "The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and *damages*" ' " (italics added)]; *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1351 (*Intel*) ["In modern American law generally, '[t]respass [to chattels] remains as an occasional remedy for minor interferences, *resulting in some damage,* but not sufficiently serious or sufficiently important to amount to the greater tort' of conversion"]; *Zaslow v. Kroenert* (1946) 29 Cal.2d 541, 551 (*Zaslow*) ["Where the conduct complained of . . . consists of intermeddling with or use of or damages to the personal property, the owner has a cause of action for trespass . . . and may recover only the *actual damages* suffered by reason of the impairment of the property or the loss of its use" (italics added)].)

Here, we conclude nonsuit was proper because Plaintiffs failed to present any evidence, much less substantial evidence (see *Nally, supra*, 47 Cal.3d at p. 291; *Joyce, supra*, 198 Cal.App.4th at p. 1488), of "actual" damages to support either cause of action.

31

For conversion, Plaintiffs contend R. Hayward took their SOPs and shared them with HEC and his wife C. Hayward.[18]  They also contend R. Hayward "used an ELI truck while working for a competitor."  There is no evidence, however, of " 'resulting damages' " based on Hayward's alleged wrongful exercise of dominion over this personal property.  (See *Voris, supra*, 7 Cal.5th at pp. 1150-1151; *Intel, supra*, 30 Cal.4th at p. 1351; *Zaslow, supra*, 29 Cal.2d at p. 551.)  Nor is there any evidence of the "time and money" Plaintiffs expended "in pursuit" of such property.  (See Civ. Code, § 3336.)[19]

Plaintiffs also contend that E. Alvarez converted their seven-page "customer" list (i.e., exhibit 114) by e-mailing it to himself a few days before he voluntarily left VEC.  Again, however, there is no evidence Plaintiffs suffered damages as a result of E. Alvarez's alleged[20] conversion of this list,

---

[18]    It is not altogether clear how, based on this evidence, HEC and/or C. Hayward would be liable for conversion based on their mere receipt of the SOPs from R. Hayward.  (See *Multani v. Knight* (2018) 23 Cal.App.5th 837, 853 [noting the " '*act* [constituting conversion] must be knowingly or intentionally done' "].)  Similarly, the only evidence of conversion by S. Alvarez appears to be her receipt of nine FRS hazardous waste "profile" sheets that E. Alvarez e-mailed her and others on January 6, 2016.  (See *id.* at p. 853.)

[19]    "The detriment caused by the wrongful conversion of personal property is presumed to be: [¶] First—The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and [¶] Second—A fair compensation for the time and money properly expended in pursuit of the property."  (Civ. Code, § 3336.)

[20]    Although we view the evidence in the light most favorable to Plaintiffs in determining whether a nonsuit was proper (see *Nally, supra*, 47 Cal.3d at p. 291), from our own review of the record there appears to be insufficient

32

or evidence of the "time and money" they expended "in pursuit" of such property. (See Civ. Code, § 3336.)

We reach the same conclusion for Tabush, who, at R. Hayward's request, used a bread knife to unlock R. Hayward's office door and retrieve the binder containing hundreds of business cards and two manuals with R. Hayward's name on their covers. Despite Plaintiffs' contention otherwise, nonsuit was proper because they offered no evidence of resulting damages from Tabush's taking of these three items, including their value at the time of conversion. (See Civ. Code, § 3336.)

Plaintiffs also contend nonsuit was improper on their trespass to chattels cause of action based on evidence R. Hayward allegedly damaged a gas meter. However as the trial court correctly noted, Plaintiffs offered no evidence of the cost to replace or fix this particular item or damages for its loss of its use. (See *Intel, supra*, 30 Cal.4th at p. 1351; *Zaslow, supra*, 29 Cal.2d at p. 551.) Nor did the trial court find evidence of injury or damage resulting from the "impairment" of other personal property, including the binder full of business cards. Regarding this latter item, which was a focus of Plaintiffs, the court remarked: "Was there a damage to that? What about loss of use of that? I don't have any evidence about that." We conclude nonsuit was also properly granted on the trespass to chattels cause of action.

_____

evidence that Plaintiffs owned the "customer" list or had the right to its possession. (See *Voris, supra*, 7 Cal.5th at p. 1150 [besides resulting damages, an essential element of conversion is a plaintiff's " 'ownership or right to possession of personal property' "].) The evidence is *uncontradicted* E. Alvarez began compiling the list in 2010, and the list was about three-quarters completed when he joined VEC in 2014.

### 4. Intentional Interference with Prospective Economic Advantage

A plaintiff asserting this tort cause of action must plead the following elements: " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) *economic harm to the plaintiff proximately caused by the acts of the defendant.*" ' " (*Korea Supply, supra*, 29 Cal.4th at p. 1153, italics added.)

We conclude nonsuit on this cause of action was proper for lack of substantial evidence that Plaintiffs suffered injury caused by the acts of Defendants. (See *Korea Supply, supra*, 29 Cal.4th at p. 1153; *Lueter, supra*, 94 Cal.App.4th at pp. 1302-1303; *GHK, supra*, 224 Cal.App.3d at p. 873.)

We separately conclude nonsuit was also proper for lack of substantial evidence that Defendants' acts caused an " ' "actual disruption" ' " of Plaintiffs' customer relationships. (See *Korea Supply, supra*, 29 Cal.4th at p. 1153.) Plaintiffs once again point to Rivera's testimony that beginning in about 2014, ELI (but not FRS) experienced a "tremendous[ ]" drop off in business from about 20 or 30 accounts she managed. But even viewed in the light most favorable to Plaintiffs (see *Nally, supra*, 47 Cal.3d at p. 291), this evidence does not support a reasonable inference that HEC,[21] C. Hayward, E. Alvarez, S. Alvarez, or even R. Hayward were individually or collectively responsible for this decline in business.

---

[21] HEC did not come into existence until about March 2016, after R. Hayward had left VEC.

### 5. Misappropriation of Trade Secrets

As summarized *ante* and as set forth in their opening brief, Plaintiffs contend they produced evidence of "three types of trade secrets: customer information (including names, preferences, and contact information), standard operating procedures, and vendor pricing."

A prima facie claim of misappropriation of trade secrets has three elements: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions *damaged* the plaintiff."[22] (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665 (*Sargent Fletcher*), italics added.)

As is the case with Plaintiffs' other tort-based causes of action, we conclude nonsuit was properly granted on their misappropriation cause of action based on the lack of substantial evidence that Defendants' "actions damaged" them. (See *Sargent Fletcher, supra*, 110 Cal.App.4th at p. 1665; see also *Nally, supra*, 47 Cal.3d at p. 291; *Joyce, supra*, 198 Cal.App.4th at p. 1488.)

Nonsuit was also proper because there was insufficient evidence Plaintiffs' customer information, SOPs, and vender pricing were a trade

---

[22] Civil Code section 3426.2, subdivision (a) permits a court to enjoin "actual or threatened" misappropriation of trade secrets, as well as to award damages for such misappropriation as provided under Civil Code section 3426.3, subdivision (a). Although Plaintiffs in their misappropriation cause of action included injunctive relief as an *alternative* to their request for $37.55 million in damages, it does not appear they sought equitable relief in the trial court, at least during their case-in-chief; nor do they argue on appeal the court erred by failing to grant such relief. We thus conclude Plaintiffs have forfeited any claim of error based on this issue. (See *Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4 [an appellant's failure to raise an argument in the opening brief forfeits the issue on appeal.)

secret. To be a trade secret information must "[d]erive[ ] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." (Civ. Code, § 3426.1, subd. (d)(1).)

Plaintiffs' customer information was not secret. As we have noted, ELI's list of "customers" (i.e., exhibit 114) was actually a list of companies E. Alvarez began compiling years before he joined VEC. The list merely set forth the names and basic contact information of companies in the waste management business. Plaintiffs' customers also were generally known to others including through the DTSC Web site.

The FRS "profile" sheets E. Alvarez sent to S. Alvarez and others also were not secret. Our independent review of the profile sheets show they were a form used by FRS containing the name of a single waste generator, the type and quantity of waste stored and/or disposed of by FRS, the date of disposal, and other basic information. As for the binder containing hundreds of business cards that Tabush returned to R. Hayward, Plaintiffs did not show it included secret information of ELI and/or FRS.

Nor did ELI keep its SOPs secret. M. Alvarez obtained some of the *same* SOPs attached to exhibit 12 directly from ELI in 2007, when he paid for and attended the "HAZWOPER" training course offered by ELI. ELI then placed no restrictions on what M. Alvarez could do with these SOPs. In addition, Crompton admitted that ELI sometimes gave customers its SOPs when bidding for jobs, without any corresponding evidence such bids were confidential and/or disclosure of the SOPs was prohibited.

Regarding vendor pricing, ELI entered into contracts with *third parties* to dispose of hazardous waste that FRS could not handle. There is no evidence these contracts were kept secret; that the third parties were

36

required to keep this pricing information secret; or the efforts ELI made, if any, to keep these prices and contracts secret.

We therefore separately conclude Plaintiffs' customer information and ELI's SOPs and vendor pricing were not trade secrets, as they derived no "independent economic value" as a result of being generally unknown to the public.  (See Civ. Code, § 3426.1, subd. (d)(1); see also *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 62 [" 'Information that is readily ascertainable by a business competitor derives no independent value from not being generally known' "].)  Nonsuit was thus properly granted on this cause of action.

### 6. Breach of Contract

VEC asserted this cause of action against former employees R. Hayward, Tabush, and E. Alvarez, based on these defendants' execution of a confidentiality agreement with this company.

The "elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting *damages* to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 (*Goldman*), italics added.)

As is the case with Plaintiffs' tort-based causes of action, nonsuit on VEC's breach of contract cause of action was proper for lack of substantial evidence that VEC suffered any harm and damages proximately caused by the acts of Defendants.  (See *Goldman, supra*, 51 Cal.4th at p. 821; see also *Nally, supra*, 47 Cal.3d at p. 291; *Joyce, supra*, 198 Cal.App.4th at p. 1488.)

Plaintiffs, however, contend there was sufficient evidence of harm based on the "comprehensive disclosure of Plaintiffs' information," which they contend "dovetailed with the loss of revenue from a large number of

customers."  But as we repeatedly have noted, there is no substantial evidence that anything Defendants did caused Plaintiffs to lose revenue. While we recognize substantial evidence may arise from inferences, such inferences must be " 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]."  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.)

Moreover, nonsuit was proper because there is no evidence these defendants disclosed *VEC's* alleged confidential information, as opposed to the information of noncontracting parties ELI and/or FRS.  "[T]he real party in interest is the party who has title to the cause of action, i.e., the one who has the right to maintain the cause of action."  (*Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144, 147.)  A real party in interest "is the owner of the cause of action" (*id.* at p. 148) and "[s]omeone who is not a party to [a] contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party" (*Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027, 1034).

Our independent review of the one-page confidentiality agreements signed by R. Hayward and Tabush[23] confirm the agreements were limited to VEC's "Confidential Information," and that the rights and remedies set forth in the agreements related to the harm VEC, and not ELI and/or FRS, suffered from such disclosure.  For this reason, we reject Plaintiffs' contention that the disclosure of *ELI's* customer information, SOPs, and vendor pricing supported *VEC's* breach of contract cause of action.

---

23    The confidentiality agreement signed by E. Alvarez does not appear to have been included in the record.

38

But that's not all. The record shows Tabush signed his confidentiality agreement on the same day he was terminated by VEC. Tabush therefore could not have breached an agreement that was not yet in existence, including when he used the bread knife to unlock R. Hayward's door.

For all these reasons, we conclude nonsuit was proper on VEC's breach of contract cause of action.

### 7. The UCL Claim

Plaintiffs' UCL claim was premised on a violation of the "statutes" and the "wrongful acts" of Defendants, as alleged in their first through fifth causes of action in the FAC. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) The UCL is a "law enforcement tool designed to protect customers and deter and punish wrongdoing." (*People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1159.)

Business and Professions Code section 17200 "borrows" violations of other laws and treats them as unlawful practices, which the UCL makes independently actionable. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) " 'Virtually any law— federal, state or local—can serve as a predicate for a [UCL] action.' " (*Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1185.)

Under the UCL's unlawful prong, courts have held that, if the underlying statutory or tort claim upon which the UCL claim is predicated is deemed invalid, the UCL claim also fails, as it "stand[s] or fall[s] depending on the fate of the antecedent substantive causes of action." (*Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 178 (*Krantz*); accord, *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 950 ["when the underlying legal claim fails, so too will a derivative UCL

claim"].)  Courts have reached the same conclusion for an unfair practice. (See *Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 951 (*Becerra*) [where an unfair business practices claim "is derivative of an underlying violation of law, it must stand or fall with the underlying claim"].)

Plaintiffs base their UCL claim on their underlying causes of action and Defendants' alleged improper use of ELI's "customer information, vendor pricing, and standard operating procedures."  Because Plaintiffs' underlying causes of action each fail as a matter of law, and the evidence is insufficient to support a finding that Plaintiffs were harmed by Defendants' purported use of *ELI's* information, Plaintiffs' UCL claim also must fail.  (See *Krantz, supra*, 89 Cal.App.4th at p. 178; *Becerra, supra*, 69 Cal.App.5th at p. 951.) The trial court therefore properly granted nonsuit on Plaintiffs' UCL claim.

### 8.  Reopening of Plaintiffs' Case-in-chief

Plaintiffs contend that, even if nonsuit was proper as to all causes of action, the trial court erred by refusing to allow them to reopen their case-in-chief and submit additional evidence to remedy the evidentiary deficiencies. We disagree.

#### a.  Additional Background

The record shows after the filing of Defendants' nonsuit motions, the trial court took a recess to review the motions.  After lunch, the court addressed the various grounds in support of its tentative to grant the motions on each cause of action.  The court found "[t]here [were] a number of deficiencies" in Plaintiffs' case and that the "overarching problem [was] the absence of any [evidence of] damages" caused by the acts of Defendants.

Plaintiffs then attempted to respond point-by-point to the trial court's comments.  In so doing, they went through a summary of the evidence, then addressed reopening, arguing: "The specific offer of proof that we can provide

40

is -- well, given what we've discussed so far is one -- among Hayward's exhibits are invoices showing his income from customers that are identified in his e-mails as customers that he was discussing while he was working with ELI. [¶] So we can certainly bring up Robert Hayward to identify that. Again, I don't think it's necessary. I think there's plenty of grounds to deny the motion for nonsuit[.]" Plaintiffs continued that, if the trial court's "goal" was to connect their damages with the acts of Defendants, there were "plenty of inferences" to make that showing, and that R. Hayward also "would be able to do that[.]"

Plaintiffs then addressed the evidence of the binder full of business cards, and the two manuals Tabush took from R. Hayward's office. The trial court noted the "source document[s]" for the manuals was "digital" and still in ELI's possession, and the only thing taken by Tabush was a "printout of those source documents[.]" The court then asked, even if there was testimony the manuals belonged to Plaintiffs, what were they worth? Plaintiffs responded that showing was "not necessary," as they had proffered sufficient evidence to show they had been harmed.

Plaintiffs next contended Defendants had been unjustly enriched by misappropriating Plaintiffs' Trade Secrets. The trial court inquired whether that would require a showing of Defendants' profits. Plaintiffs replied they would call Kelly Allen, Hayward's damages expert, to testify on this issue. After additional argument, the court again paused the hearing to research the "issue of reopening," noting Plaintiffs "need[ed] to make a very specific offer of proof about what piece of evidence [was necessary to] reopen to address the gap."

When the hearing reconvened, the trial court confirmed Plaintiffs had a right to reopen but only if they could make an " 'offer of proof' " describing the

41

additional evidence they intended to present and " 'how it would cure the deficiencies.' " Plaintiffs responded they would recall R. Hayward and C. Hayward to identify various "invoices" that would show Hayward obtained revenue from three of ELI's customers, which in turn would satisfy the court's concern about a lack of a "nexus." The court rejected this offer of proof, noting revenue was "quite different from income or profit," and what was missing was expert testimony regarding Hayward's profit. It also rejected their argument these invoices would show Hayward was unjustly enriched based on the revenue generated from these three companies. Plaintiffs then asked for additional time to subpoena Kelly Allen. The court commented it was "absolutely astonish[ed]" that Plaintiffs were going to call an opposing expert to replace Ghosn's opinion testimony, denied the request to reopen, and granted nonsuit.

### b. Guiding Principles and Analysis

In response to a nonsuit motion, a plaintiff has the right, upon request, to reopen the plaintiff's case-in-chief and present additional evidence: "[I]t is the trial court's duty, if so requested, to permit the plaintiff to reopen his [or her] case and introduce further evidence." (*Charles C. Chapman Building Co. v. California Mart* (1969) 2 Cal.App.3d 846, 858.) Key to the instant case, a request to reopen must include an offer of proof describing the evidence with particularity and how such evidence would cure the deficiencies. (See *Alpert, supra*, 81 Cal.App.4th at p. 1337.) And even if the trial court errs in refusing a request to reopen, that error must be prejudicial. (*Chapman Building*, at pp. 858-859; accord, *Abreu v. Sevenhard's Swedish Bakery* (1989) 208 Cal.App.3d 1446, 1457 [no reversible error in refusing to reopen for testimony that still would not prove plaintiff's claim].)

We independently conclude the trial court properly refused Plaintiffs' request to reopen their case-in-chief. Recalling R. Hayward and/or C. Hayward, as Plaintiffs proposed, to testify about various invoices did not cure the "overarching problem" identified by the court of the lack of substantial evidence of a "nexus" between Plaintiffs' injury and Defendants' conduct. The same holds true for subpoenaing and calling Hayward's own damages expert, as Allen's opinions were merely based on the *assumption* that Plaintiffs had suffered injury-in-fact, but were not independent proof of such injury.

Finally, because our review of a nonsuit is de novo and we have independently concluded Plaintiffs' offer of proof was insufficient to reopen their case-in-chief, we reject their claim the trial court legally erred in requiring, as a condition to reopening, a showing they had been " 'diligent in obtaining and producing the evidence.' " In any event, we note the court correctly stated the law when it found after the second recess that Plaintiffs' right to reopen was conditioned on their making a sufficient offer of proof to cure the evidentiary deficiencies, which the court then found Plaintiffs had not done.[24]

### E. *Postjudgment Orders*

### 1. Attorney Fees Award

A trial court may award reasonable attorney fees and costs to a prevailing defendant when a plaintiff's "claim of misappropriation is made in

---

[24]  In light of our decision that nonsuit was properly granted as to all causes of action, we deem it unnecessary to decide Defendants' alternative argument that Plaintiffs' common law causes of action were preempted under this state's Uniform Trade Secret Act (Civ. Code, § 3426 et seq.).

bad faith." (Civ. Code, § 3426.4.)[25] " '[B]ad faith' as used in [Civil Code] section 3426.4 consists of both 'objective speciousness of the plaintiff's claim . . . and . . . subjective bad faith in bringing or maintaining the claim.' " (*SASCO v. Rosendin Electric, Inc.* (2012) 207 Cal.App.4th 837, 845 (*SASCO*), quoting *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1262.) "Objective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1276 (*FLIR Systems*), citing *Gemini*, at p. 1262.)

"Section 3426.4 authorizes the trial court to award attorney fees as a deterrent to specious trade secret claims. [Citation.] Because the award is a sanction, a trial court has broad discretion in awarding fees." (*FLIR Systems, supra*, 174 Cal.App.4th at p. 1275; accord, *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 577 [an award of attorney fees "will not be overturned in the absence of a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence"].)

The record shows the trial court awarded Hayward attorney fees of $254,147.40 for Plaintiffs' "bad faith" in asserting their misappropriation cause of action. The court in its December 15 and 30, 2021 minute orders found the award was justified based on Plaintiffs' failure to proffer sufficient

---

[25] "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party. Recoverable costs hereunder shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party." (Civ. Code, § 3426.4.)

evidence that information alleged to be trade secrets (i.e., customer information, SOPs, and vendor pricing) had "independent economic value"; or that Plaintiffs undertook reasonable efforts to keep such information confidential; or that they suffered any resulting damages from its misappropriation. In light of our decision that nonsuit on Plaintiffs' misappropriation claim was proper, including on these grounds, we conclude their misappropriation claim satisfies the "objective speciousness" requirement. (See *SASCO, supra*, 207 Cal.App.4th at pp. 848-849 [claim was objectively specious due to absence of evidence of misappropriation].)

Plaintiffs, however, contend the trial court committed error because it failed to find they acted in subjective bad faith. "Subjective bad faith under [Civil Code] section 3426.4 means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition" (*SASCO, supra*, 207 Cal.App.4th at p. 847); and may be inferred from such evidence (*FLIR Systems, supra*, 174 Cal.App.4th at p. 1278).

At a hearing in March 2016 on Plaintiffs' application for a preliminary injunction, the trial court[26] found Plaintiffs had made an insufficient showing of "likelihood of success" on the merits of their misappropriation claim, including because the information they claimed was misappropriated was likely not a trade secret.

Specifically, during the injunction hearing the trial court found that the customer list (E. Alvarez e-mailed to himself) contained general information available from "public sources" including the DTSC Web site; that there was no evidence Plaintiffs went to "great expense and effort" to compile the list;

---

[26]    We note the judge at the March 2016 injunction hearing was the *same* judge who presided over the June 2021 trial and granted Defendants' nonsuit motions.

45

and therefore, that the list did not provide "independent economic value" to Plaintiffs. The court also found that the 21 SOPs R. Hayward e-mailed to M. Alvarez were likely not a trade secret, noting many of them were training forms and manuals and were based on public information including the Code of Federal Regulations; and that the vendor pricing information was also likely not a secret, as it appeared they were merely "pricing lists, which would be information that is generally available to the public." Significantly, this is the nearly the *same* information Plaintiffs relied on at trial to support their nonsuited misappropriation claim.

We conclude the evidence from the March 2016 hearing and the inferences drawn from their lack of evidence on this cause of action are sufficient to support a finding of Plaintiffs' subjective bad faith. (See *FLIR Systems, supra*, 174 Cal.App.4th at p. 1278 [noting an inference of subjective bad faith may be found when a plaintiff "proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel"].) We thus affirm the award of attorney fees for Hayward, as Plaintiffs on appeal do not challenge the amount of that award.

### 2. Expert Witness Fees

Following the trial court's granting of his nonsuit motion, Tabush sought costs including expert witness fees of $13,525.60. Tabush based the request on his March 2018 offer to compromise under section 998, in which he requested a waiver of costs in exchange for his dismissal with prejudice. Plaintiffs moved to tax only the expert fees in Tabush's memorandum of costs.

At the November 2021 hearing, Plaintiffs argued there was no evidence that Tabush's forensic accounting expert, Jennie McNulty, had provided any value in assisting Tabush in the preparation of his case. Tabush disagreed,

46

relying in part on McNulty's billings that were included in his opposition, which showed the work she had done as he prepared for trial.  The court took the matter under submission.

The trial court subsequently adopted its tentative, allowing Tabush to recover expert fees other than $440, which was the cost of preparing McNulty for a deposition that did not go forward.  The court found that, although McNulty was not deposed and she did not prepare any reports, it was "reasonable" for Tabush to hire a forensic accountant because the instant case involved "complex issues of trade secrets and lost profits."  The court noted all of McNulty's invoices postdated Tabush's March 2018 offer to compromise, and the invoices supported Tabush's representation that McNulty was used for "consulting purposes."

A prevailing party is entitled to recover costs.  (§ 1032, subd. (b).) Section 1033.5, subdivision (a), lists the costs a prevailing party is entitled to recover, and section 1033.5, subdivision (b), lists costs that are not recoverable.  Costs neither permitted under section 1033.5, subdivision (a), nor prohibited under section 1033.5, subdivision (b), "may be allowed or denied in the court's discretion."  (§ 1033.5, subd. (c)(4).)  "Allowable costs must be 'reasonably necessary to the conduct of the litigation' and 'reasonable in amount' " and not " 'merely convenient or beneficial to its preparation.' " (*Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 693; see § 1033.5, subd. (c)(2).)  "Costs are allowable if incurred, whether or not paid."  (§ 1033.5, subd. (c)(1).)

Although expert witness fees are generally not recoverable under section 1033.5, they may be recoverable under section 998:  "If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment or award . . . , the court . . . , in its discretion, may require

47

the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial . . . , or during trial . . . , of the case by the plaintiff, in addition to plaintiff's costs." (§ 998, subd. (d).) Expert witness fees are recoverable even if the expert does not testify, so long as the expert "aided in the preparation of the case for trial" and "is a potential witness." (*Evers v. Cornelson* (1984) 163 Cal.App.3d 310, 317.)

" 'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion.' " (*Rozanova v. Uribe* (2021) 68 Cal.App.5th 392, 399 (*Rozanova*); accord, *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 990.) We also review a trial court's award of costs under section 998 for abuse of discretion. (*Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 221 (*Bates*).)

We conclude the trial court acted well within its discretion in taxing only $440 of Tabush's expert witness fees. (See *Rozanova, supra*, 68 Cal.App.5th at p. 399; *Bates, supra*, 204 Cal.App.4th at p. 221.) As noted, Plaintiffs were seeking damages in excess of $37.55 million against Tabush and the other defendants in a case involving "complex issues of trade secrets and lost profits," as found by the court and as borne out by the issues in this appeal. It was reasonable for Tabush to hire a forensic accountant to assist him in preparing for trial. The record shows McNulty reviewed more than 4,000 pages of discovery and documents and several volumes of deposition transcripts. Tabush also provided copies of her time, broken down by project. Based on this record and the applicable standard of review, we cannot say the

48

court's decision to tax only $440 of Tabush's expert witness fees was an abuse of discretion.

## III.  DISPOSITION

The judgment for Defendants R. Hayward, C. Hayward, HEC, Tabush, E. Alvarez, and S. Alvarez is affirmed.  The postjudgment orders awarding Hayward attorney fees and refusing to tax Tabush's expert witness fees (other than for $440) are also affirmed.  R. Hayward, C. Hayward, HEC, and Tabush are entitled to their costs of appeal.  (See Cal. Rules of court, rule 8.278(a)(1), (2).)


MCCONNELL, P. J.


WE CONCUR:

BUCHANAN, J.

KELETY, J.